# NORTH AMERICAN COMMERCIAL COMPANY *v.* UNITED STATES.

CERTIORARI. TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 431. Argued April 18, 19, 1898. — Decided May 31, 1898.

By the agreement of March 12, 1890, between the United States and the North American Commercial Company, that company contracted to pay to the United States a rental of $60,000 per year, during the term of the contract, for the privilege of killing an agreed number of seals each year, subject to a proportionate reduction of this fixed rental, in case of a limitation in the number; and also a further sum of seven dollars, sixty two and one half cents for each seal taken and shipped by it. *Held* that this per capita tax was not a part of the annual rental, and was not subject to reduction as was the annual rental of $60,000 a year.

The proviso in the original act for the naming of a maximum number of seals to be taken, which was not to be exceeded, and making a proportionate reduction in the fixed rental in case of a limitation of that number, remained in force through all subsequent legislation and contracts.

Assuming that the company took all the risk of a catch reduced by natural causes, yet when the number that might be killed was reduced by the act of the Government, the company was entitled to such reduction on the reserved rental as might be proper, that is, in the same proportion as the number of skins permitted to be taken bore to the maximum.

The power to regulate the seal fisheries in the interest of the preservation of the species was a sovereign protective power, subject to which the lease was taken, and if the Government found it necessary to exercise that power, to the extent which appears, the company did not attempt to rescind or abandon, but accepted the performance involved in the delivery of the 7500 skins.

The company cannot maintain its counterclaim for damages for breach of the lease, and the Circuit Court erred in its disposition thereof.

THIS was an action brought by the United States against the North American Commercial Company to recover the sum of $132,187.50, with interest, for rent reserved for the year ending April 1, 1894, under a so called lease, bearing date March 12, 1890, made by the Secretary of the Treasury to the company, and for royalties upon seventy-five hundred fur seal skins taken and shipped by the company that year in virtue of that instrument, and for the revenue tax of two

dollars on each skin.    The claim of the Government consisted of these items: .

| | |
|---|---:|
| Annual rental | $60,000 00 |
| Revenue tax on 7500 skins at $2 | 15,000 00 |
| Per capita at $7.62½ on 7500 skins | 57,187 50 |
| Total | $132,187 50 |

And interest thereon from April 1, 1894.

The case was tried by the Circuit Court without a jury. The court found for the United States in the sum of $94,687.50; with interest, and judgment was entered in their favor for $107,257.29, principal, interest and costs.    74 Fed. Rep. 145.

The company having taken a writ of error to the Circuit Court of Appeals for the Second Circuit, that court certified a certain question arising in the cause concerning which it desired the instructions of this court for its proper decision, whereupon this court ordered that the whole record and cause be sent up for consideration.    A counterclaim of the company against the United States for breach of the lease was disallowed and dismissed by the Circuit Court, but not on the merits, and without prejudice to the right of the company to enforce the same by any other proper legal proceeding.

The agreement of lease out of which the cause of action arose is as follows:

. "This indenture, made in duplicate this twelfth day of March, 1890, by and between William Windom, Secretary of the Treasury of the United States, in pursuance of chapter 3 of title 23, Revised Statutes, and the North American Commercial Company, a corporation duly established under the laws of the State of California, and acting by I. Liebes, its president, in accordance with a resolution of said corporation adopted at a meeting of its board of directors held January 4, 1890, witnesseth: That the said Secretary of the Treasury, in consideration of the agreements hereinafter stated, hereby leases to the said North American Commercial Company for a term of twenty years from the first day of May, 1890, the

exclusive right to engage in the business of taking fur seals on the islands of St. George and St. Paul, in the territory of Alaska, and to send a vessel or vessels to said islands for the skins of such seals.

"The said North American Commercial Company, in consideration of the rights secured to it under this lease above stated, on its part covenants and agrees to do the things following, that is to say:

"To pay to the Treasurer of the United States each year during the said term of twenty years, as annual rental, the sum of sixty thousand dollars, and in addition thereto agrees to pay the revenue tax or duty of two dollars laid upon each fur seal skin taken and shipped by it from the islands of St. George and St. Paul, and also to pay to said Treasurer the further sum of seven dollars sixty-two and one half cents apiece for each and every fur seal skin taken and shipped from said islands, and also to pay the sum of fifty cents per gallon for each gallon of oil sold by it made from seals that may be taken on said islands during the said period of twenty years, and to secure the prompt payment of the sixty thousand dollars rental above referred to the said company agrees to deposit with the Secretary of the Treasury bonds of the United States to the amount of fifty thousand dollars, face value, to be held as a guarantee for the annual payment of said sixty thousand dollars rental, the interest thereon when due to be collected and paid to the North American Commercial Company, provided the said company is not in default of payment of any part of the said sixty thousand dollars rental.

"That it will furnish to the native inhabitants of said islands of St. George and St. Paul annually such quantity or number of dried salmon and such quantity of salt and such number of salt barrels for preserving their necessary supply of meat as the Secretary of the Treasury shall from time to time determine.

"That it will also furnish to the said inhabitants eighty tons of coal annually and a sufficient number of comfortable dwellings in which said native inhabitants may reside, and

will keep said dwellings in proper repair, and will also provide and keep in repair such suitable schoolhouses as may be necessary, and will establish and maintain during eight months of each year proper schools for the education of the children on said islands, the same to be taught by competent teachers, who shall be paid by the company a fair compensation, all to the satisfaction of the Secretary of the Treasury, and will also provide and maintain a suitable house for religious worship, and will also provide a competent physician or physicians and necessary and proper medicines and medical supplies, and will also provide the necessaries of life for the widows and orphans and aged and infirm inhabitants of said islands who are unable to provide for themselves; all of which foregoing agreements will be done and performed by the said company free of all costs and charges to said native inhabitants of said islands or to the United States.

"The annual rental, together with all other payments to the United, States provided for in this lease, shall be made and paid on or before the first day of April of each and every year during the existence of this lease, beginning with the first day of April, 1891.

"The said company further agrees to employ the native inhabitants of said islands to perform such labor upon the islands as they are fitted to perform and to pay therefor a fair and just compensation, such as may be fixed by the Secretary of the Treasury; and also agrees to contribute, as far as in its power, all reasonable efforts to secure the comfort, health, education and promote the morals and civilization of said native inhabitants.

"The said company also agrees faithfully to obey and abide by all rules and regulations that the Secretary of the Treasury has heretofore or may hereafter establish or make in pursuance of law concerning the taking of seals on said islands, and concerning the comfort, morals and other interests of said inhabitants, and all matters pertaining to said islands and the taking of seals within the possession of the United States. It also agrees to obey and abide by any restrictions or limitations upon the right to kill seals that the Secretary

of the Treasury shall judge necessary, under the law for the preservation of the seal fisheries of the United States; and it agrees that it will not kill, or permit to be killed, so far as it can prevent, in any year a greater number of seals than is authorized by the Secretary of the Treasury.

"The said company further agrees that it will not permit any of its agents to keep, sell, give or dispose of any distilled spirits or spirituous liquors or opium on either of said islands or the waters adjacent thereto to any of the native inhabitants of said islands, such person not being a physician and furnishing the same for use as a medicine.

"It is understood and agreed that the number of fur seals to be taken and killed for their skins upon said islands by the North American Commercial Company during the year ending May 1, 1891, shall not exceed sixty thousand.

"The Secretary of the Treasury reserves the right to terminate this lease and all rights of the North American Commercial Company under the same at any time on full and satisfactory proof that the said company has violated any of the provisions and agreements of this lease, or in any of the laws of the United States, or any treasury regulation respecting the taking of fur seals or concerning the islands of St. George and St. Paul or the inhabitants thereof."

The Circuit Court made eighteen findings, including the following:

"Sixth. The said islands of St. George and St. Paul in the Territory of Alaska are the breeding ground of a herd of seals which in the early spring moves northward to Behring Sea, and are the habitat of that herd during the summer and fall of each year; that the seals land in great numbers upon the said islands and divide into families, each consisting of one male or bull and many females or cows; that the young or male seals, or bachelors as they are called, are not admitted to the breeding ground, but are driven off by the older males and oftentimes destroyed by them; that until such bachelor seals arrive at the age of three or four years they occupy other portions of the islands and can be driven away from the breeding ground and killed without disturbing the seals

on the breeding grounds; that a large proportion of these young bachelor seals may be so killed without diminishing the birth rate of the herd, and their skins are a valuable article of commerce and are more valuable than the skins of the females or older males; that by protecting the females and restricting the capture to the bachelors the fisheries are capable of a permanent and annual supply of skins which would afford a valuable source of revenue.

"Seventh. That after the making of the said lease by the said plaintiff and the said defendant, the said defendant entered upon the enjoyment of the right thereby granted it; but on account of the enforcement by the said plaintiff of the provisions of a convention or agreement made and entered into by the said plaintiff with the Government of Great Britain it prohibited and prevented the said defendant, during the years 1890, 1891 and 1892, from taking on the said islands as many seals as might have been taken without diminution of the herd, and far less in each year than the number mentioned in the said lease for the first year; the numbers taken in those years being in 1890, 20,995; in 1891, 13,482; and in 1892, 7547.

"Eighth. That for the said years of 1890, 1891 and 1892, it was agreed between the Secretary of the Treasury and the said defendant that the said defendant should pay to the said plaintiff for the seal skins taken by it on the said islands the tax and such proportionate part of the rental of $60,000 and the per capita sum of seven dollars sixty-two and one half cents, as the number of seals taken bore to one hundred thousand, except that for 1890 the per capita of seven dollars sixty-two and one half cents was not so reduced.

"Ninth. That by a convention or agreement with the Government of Great Britain, commonly called the *modus vivendi,* the United States promised, during the pendency of the arbitration between those two governments relating to the Behring Sea controversy and the preservation of the seals resorting to those waters, to prohibit seal killing on the said islands in excess of 7500 to be taken from the islands for the subsistence of the natives, and to use promptly its best efforts to insure the enforcement of the prohibition.

"Tenth. That pursuant to such agreement the United States prohibited and prevented the said defendant from taking any seals whatever from the said islands during the year 1893, and thus deprived the said defendant of the benefit of its said lease.

"Eleventh. That the Secretary of the Treasury did not exercise the discretion conferred upon him by section 1962 of the Revised Statutes to limit the right of killing seals when necessary for the preservation of such seals, and did not so limit or restrict the right of the said defendant to take seals under its said lease for the year 1893, and that during that year it was not necessary or even desirable for the preservation of such seals to limit the killing of the seals upon the said islands to the said number of 7500 specified in the said *modus vivendi.*

"Twelfth. That in the year 1893 the United States Government itself, through the agents of the Treasury Department, took upon the said islands 7500 seals; that the said defendant was permitted to coöperate in selecting the seals so killed, and to take, and it did take and retain the skins of those seals, and in this way, and in this way only, the defendant received those 7500 skins.

"In accordance with the power reserved to him in said contract, the Secretary of the Treasury at the commencement of the seal-killing season for the year ending April 1, 1894, fixed the compensation of the natives upon the islands of St. Paul and St. George to be paid to them by the defendant for killing the seals, sorting the skins, and loading them on board the defendant's steamer, at 50 cents for each skin taken from the islands during the said season; and defendant paid to the natives said compensation, to wit, the sum of $3750.

"Thirteenth. That 20,000 bachelor seals could have been killed upon the said islands during the year 1893 in the customary way, without injury to or diminution of the herd, and the said defendant would have taken that number had it been permitted so to do.

"Fourteenth. That if the said defendant had been allowed to and had taken in the year 1893, under its said lease, 20,000

seal skins, there would have been due to the said plaintiff the $60,000 rental and for the per capita of seven dollars and sixty-two and one half cents and the revenue tax of two dollars per skin, the sum of $192,500, making together the sum of $252,500 — that is, twelve dollars and sixty-two and one half cents for each seal skin taken; that for the 7500 received by the said defendant, as above set forth, it owes to the said plaintiff the said sum of twelve dollars and sixty-two and one half cents apiece, amounting to the sum of $94,687.50.

"Fifteenth. The defendant could have sold 12,500 more seal skins if it had been allowed to take the same on the said islands during the year 1893, at the average market price of twenty-four dollars for each skin; which for the said number of 12,500 which it might have taken, but was prevented from taking by the act of the Government of the United States, would amount to $300,000; that for such 12,500 seal skins the said defendant would have been liable to pay, according to the terms of its lease if had taken 20,000 seal skins during that year, the sum of twelve dollars and sixty-two and one half cents each, amounting to $157,812.50, which being deducted from the price at which such skins could have been sold, namely, $300,000, leaves as the net loss sustained by the said defendant in consequence of the breach of its said lease by the said plaintiff, the sum of $142,187.50, which is due and owing to the said defendant by the said plaintiff; and that its claim therefor would be a proper matter of counterclaim or credit in this action, if the conditions prescribed by section 951 of the United States Revised Statutes had been complied with by the said defendant."

"Eighteenth. The defendant did not present to the accounting officers of the Treasury for their examination any claim for damages by reason of the losses alleged to have been incurred by the defendant by reason of the action of the United States in entering into the said convention or *modus vivendi* with Great Britain and limiting the catch of seals upon the said islands to 7500; and such claim was not disallowed by the accounting officers of the Treasury in whole or in part, and it was

not proved to the satisfaction of the court that the defendant was at the time of the trial of this action in possession of vouchers not before in its power to procure, or that the defendant was prevented from exhibiting its said alleged claim at the Treasury by absence from the United States or by unavoidable accident."

The Circuit Court made these conclusions of law:

"First. That the said defendant, having received the said 7500 seal skins taken from the said islands during the year 1893, is liable to pay the said plaintiff therefor the said sum of $94,687.50, with interest thereon from the first day of April, 1894; and the said plaintiff is entitled to recover in this action said sum, with interest as aforesaid, from the said defendant.

"Second. That by reason of the breach of the said lease by the said plaintiff, prohibiting the said defendant from taking any seal skins during the year 1893, the said plaintiff is liable to the said defendant for the said sum of $142,187.50, with interest thereon from the first day of December, 1894.

"That on account of the same claim of the said defendant against the said plaintiff for damages for breach of the said lease not having been presented to and disallowed by the accounting officers of the Treasury, it cannot be allowed as a counterclaim or credit in this action, and the said counterclaim is therefore dismissed, but not on the merits thereof, and without prejudice to the right of the said defendant to enforce the same by any other proper legal proceeding."

*Mr. James C. Carter* for plaintiff in error.

*Mr. Attorney General* for defendants in error.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

By the act of July 27, 1868, c. 273, 15 Stat. 240, the laws of the United States relating to customs, commerce and navigation were extended over all the mainland, islands and

waters of the territory ceded to the United States by the Emperor of Russia, March 30, 1867, so far as applicable, and by section six of that act it was made unlawful for any person or persons to kill any otter, mink, marten, sable or fur seal, or any other fur-bearing animal within the limits of said territory, or in the waters thereof; provided that the Secretary of the Treasury might ' authorize the killing of any such fur-bearing animal, except fur seals, under such regulations as he might prescribe, and it was made his duty to prevent the killing of any fur seal, and to provide for the execution of the provisions of the section until otherwise provided by law. On the third of March, 1869, a resolution was approved, 15 Stat. 348, No. 22, entitled " A resolution more efficiently to protect the fur seal in Alaska," declaring the islands of St. Paul and St. George in Alaska "a special reservation for government purposes," and that, until otherwise provided by law, it should be unlawful for any person to land or remain on either of said islands, except by the authority of the Secretary of the Treasury.

July 1, 1870, an act entitled "An act to prevent the extermination of fur-bearing animals in Alaska" was approved. 16 Stat. 180, c. 189. By the first section it was made unlawful to kill any fur seal upon the islands of St. Paul and St. George or in the waters adjacent thereto, except during the months of June, July, September and October in each year, or to kill such seals at any time by the use of firearms, or to use other means tending to drive the seals away from said islands. Provided, that the natives should have the privilege of killing such young seals as might be necessary for their own food and clothing during other months, and also such old seals as might be required for their own clothing and for the manufacture of boats for their own use, which killing should be limited and controlled by such regulations as should be prescribed by the Secretary of the Treasury.

By section two it was made unlawful to kill any female seal, or any seal less than one year old, at any season of the year, except as above provided; and also to kill any seal in the waters adjacent to the islands, or on the beaches, cliffs or rocks where they haul up from the sea to remain.

The third section reads as follows:

"SEC. 3. That for the period of twenty years from and after the passage of this act the number of fur seals which may be killed for their skins upon the island of St. Paul is hereby limited and restricted to seventy-five thousand per annum; and the number of fur seals which may be killed for their skins upon the island of St. George is hereby limited and restricted to twenty-five thousand per annum: *Provided*, That the Secretary of the Treasury may restrict and limit the right of killing if it shall become necessary for the preservation of such seals, with such proportionate reduction of the rents reserved to the government as shall be right and proper; and if any person shall knowingly violate either of the provisions of this section, he shall, upon due conviction thereof, be punished in the same way as provided herein for a violation of the provisions of the first and second sections of this act."

The fourth section provided that immediately after the passage of the act the Secretary of the Treasury should lease for the rental mentioned in the sixth section of the act, to the best advantage of the United States, having due regard for the interests of the government, the native inhabitants, parties theretofore engaged in trade, and the protection of the seal fisheries, for a term of twenty years from the first day of May, 1870, "the right to engage in the business of taking fur seals on the islands of St. Paul and St. George, and to send a vessel or vessels to said islands for the skins of such seals," giving a lease duly executed, and not transferable, and taking from the lessee or lessees a bond, conditioned "for the faithful observance of all the laws and requirements of Congress and of the regulations of the Secretary of the Treasury touching the subject-matter of taking fur seals, and disposing of the same, and for the payment of all taxes and dues accruing to the United States connected therewith; and in making said lease the Secretary of the Treasury shall have due regard to the preservation of the seal fur trade of said islands, and the comfort, maintenance and education of the natives thereof."

The fifth section read:

· " SEC. 5. That at the expiration of said term of twenty years, or on surrender or forfeiture of any lease, other leases may be made in manner as aforesaid, for other terms of twenty years; . . . and any person who shall kill any fur seal on either of said islands, or in the waters adjacent thereto, without authority of the lessees thereof, and any person who shall molest, disturb or interfere with said lessees, or either of them, or their agents or employés in the lawful prosecution of their business, under the provisions of this act, shall be deemed guilty of a misdemeanor, and shall for each offence, on conviction thereof, be punished in the same way and by like penalties as prescribed in the second section of this act; and all vessels, their tackle, apparel, appurtenances and cargo, whose crews shall be found engaged in any violation of either of the provisions of this section, shall be forfeited to the United States; and if any person or company, under any lease herein authorized, shall knowingly kill, or permit to be killed, any number of seals exceeding the number for each island in this act prescribed, such person or company shall, in addition to the penalties and forfeitures aforesaid, also forfeit the whole number of the skins of seals killed in that year, or, in case the same have been disposed of, then said person or company shall forfeit the value of the same. . . ."

By the sixth section it was provided that " the annual rental to be reserved by said lease shall not be less than fifty thousand dollars per annnm, . . . and in addition thereto, a revenue tax or duty of two dollars is hereby laid upon each fur seal skin taken and shipped from said islands during the continuance of such lease to be paid into the Treasury of the United States; and the Secretary of the Treasury is hereby empowered and authorized to make all needful rules and regulations for the collection and payment of the same, for the comfort, maintenance, education and protection of the natives of said islands, and also for carrying into full effect all the provisions of this act."

These provisions as well as others from the prior legislation were carried forward into the Revised Statutes, approved

June 22, 1874, sections 1954 to 1976 constituting chapter three of Title XXIII, relating to the territory of Alaska, and sections 1956 to 1976 thereof to the subject under consideration.

By section 1960 the killing of any fur seals upon the islands or their adjacent waters was forbidden, except during June, July, September and October in each year, etc., with the same proviso as in the first section of the act of 1870.

Sections 1962, 1963, 1968, 1969, 1972 and 1973 were as follows:

"Sec. 1962.  For the period of twenty years from the first of July, eighteen hundred and seventy, the number of fur seals which may be killed for their skins upon the island of St. Paul is limited to seventy-five thousand per annum; and the number of fur seals which may be killed for their skins upon the island of St. George is limited to twenty-five thousand per annum; but the Secretary of the Treasury may limit the right of killing, if it becomes necessary for the preservation of such seals, with such proportionate reduction of the rents reserved to the Government as may be proper; and every person who knowingly violates either of the provisions of this section shall be punished as provided in the preceding section.

"Sec. 1963.  When the lease heretofore made by the Secretary of the Treasury to 'The Alaska Commercial Company,' of the right to engage in taking fur seals on the islands of Saint Paul and Saint George, pursuant to the act of July 1, 1870, chapter 189, or when any future similar lease expires, or is surrendered, forfeited or terminated, the Secretary shall lease to proper and responsible parties, for the best advantage of the United States, having due regard to the interests of the Government, the native inhabitants, their comfort, maintenance and education, as well as to the interests of the parties heretofore engaged in trade and the protection of the fisheries, the right of taking fur seals on the islands herein named, and of sending a vessel or vessels to the islands for the skins of such seals for the term of twenty years, at an annual rental of not less than fifty thousand dollars, to be reserved in such lease and secured by a deposit of United

States bonds to that amount, and every such lease shall be duly executed in duplicate, and shall not be transferable."

"SEC. 1968. If any person or company, under any lease herein authorized, knowingly kills, or permits to be killed, any number of seals exceeding the number for each island in this chapter prescribed, such person or company shall, in addition to the penalties and forfeitures herein provided, forfeit the whole number of the skins of seals killed in that year, or, in case the same have been disposed of, then such person or company shall forfeit the value of the same.

"SEC. 1969. In addition to the annual rental required to be reserved in every lease, as provided in section nineteen hundred and sixty-three, a revenue tax or duty of two dollars is laid upon each fur seal skin taken and shipped from the islands of Saint Paul and Saint George, during the continuance of any lease, to be paid into the Treasury of the United States; and the Secretary of the Treasury is empowered to make all needful regulations for the collection and payment of the same, and to secure the comfort, maintenance, education and protection of the natives of those islands, and also to carry into full effect all the provisions of this chapter except as otherwise prescribed."

"SEC. 1972. Congress may at any time hereafter alter, amend or repeal sections from nineteen hundred and sixty to nineteen hundred and seventy-one, both inclusive, of this chapter.

"SEC. 1973. The Secretary of the Treasury is authorized to appoint one agent and three assistant agents who shall be charged with the management of the seal fisheries in Alaska, and the performance of such other duties as may be assigned to them by the Secretary of the Treasury."

Pending the adoption of the Revised Statutes, and on March 24, 1874, 18 Stat. 24, c. 64, the act of July 1, 1870, was amended so as to authorize the Secretary of the Treasury to designate the months in which fur seals "may be taken for their skins on the islands of St. Paul and St. George, in Alaska, and in the waters adjacent thereto, and the number to be taken on or about the islands respectively." Thus the

Revised Statutes were in effect amended so that whereas by section 1960 the months of June, July, September and October had been designated as the months in which fur seals might be taken on the islands and in the waters adjacent thereto, for their skins, and by section 1962 the maximum number which might be killed on the island of St. Paul was limited to 75,000, and on the island of St. George to 25,000, per annum, the Secretary of the Treasury was authorized by the amendatory act to designate the months in which fur seals might be taken, and the number to be taken on or about each island respectively. The times of killing and the number to be killed were left to the judgment of the Secretary of the Treasury.

Manifestly the object the Government had in view throughout this legislation was the preservation by proper regulations of the fur-bearing animals of Alaska, including, and particularly, the fur seals.

The first twenty years being about to expire the Secretary of the Treasury on December 24, 1889, advertised for proposals "for the exclusive right to take fur seals upon the islands of St. Paul and St. George, Alaska, for the term of twenty (20) years from the first day of May, 1890, agreeably to the provisions of the statutes of the United States." Among other things, the advertisement stated: "The number of seals to be taken for their skins upon said islands during the year ending May 1, 1891, will be limited to sixty thousand (60,000), and for the succeeding years the number will be determined by the Secretary of the Treasury, in accordance with the provisions of law."

There were twelve proposals or bids, of which the North American Commercial Company put in three, numbered 10, 11 and 12, each of which offered a gross sum as rental, and, in addition to that and the revenue tax, a royalty per capitem. The three bids set forth the advertisement at length. No. 10 contained a proviso that the proposal was made on the express condition that the United States should not, through the Secretary of the Treasury, or otherwise, limit the skins to be taken to any number less than one hundred thousand skins per

annum after the first year of the lease; and No. 12 made
the express condition that the United States should protect
the exclusive right of the fur seal fisheries in and within the
islands, and the waters known as the "Behring Sea." No. 11
contained no such express conditions, and it was this bid which
was accepted by the Government. The lease in question was
thereupon entered into "in pursuance of chapter 3 of title 23,
Revised Statutes," as it recites.

By its terms, the company undertook, in consideration of
the lease for twenty years of "the exclusive right to engage
in the business of taking fur seals on the islands of St. George
and St. Paul, in the Territory of Alaska, and to send a vessel
or vessels to said islands for the skins of such seals," "to pay
to the Treasurer of the United States each year during the
said term of twenty years, as annual rental, the sum of sixty
thousand dollars, and in addition thereto agrees to pay the
revenue tax or duty of two dollars upon each fur seal skin
taken and shipped by it from the islands of St. George and
St. Paul, and also to pay to said Treasurer the further sum
of seven dollars sixty-two and one half cents apiece for each
and every fur seal skin taken and shipped from said islands,
. . . and to secure the sixty thousand dollars rental above
referred to" to deposit United States bonds of the face value
of fifty thousand dollars; and further "faithfully to obey and
abide by all rules and regulations that the Secretary of the
Treasury has heretofore or may hereafter establish or make
in pursuance of law concerning the taking of seals on said
islands, and concerning the comfort, morals and other inter-
ests of said inhabitants, and all matters pertaining to said
islands and the taking of seals within the possession of the
United States. It also agrees to obey and abide by any re-
strictions or limitations upon the right to kill seals that the
Secretary of the Treasury shall adjudge necessary, under the
law, for the preservation of the seal fisheries of the United
States; and it agrees that it will not kill, or permit to be
killed, so far as it can prevent, in any year a greater number
of seals than is authorized by the Secretary of the Treasury."

It was also agreed that, "the annual rental, together with

all other payments to the United States provided for in this lease, shall be made and paid on or before the first day of April of each and every year during the existence of this lease, beginning with the first day of April, 1891." The lease also provided that the number of fur seals to be taken and killed for their skins during the year ending May 1, 1891, should not exceed sixty thousand.

1. It is contended on behalf of the company that, conceding that the right of killing in 1893 had been duly limited to seventy-five hundred seals, and that it took and received that number of skins as full performance of the covenants of the lease on the part of the Government, it is entitled under section 1962 of the Revised Statutes to a proportionate reduction of the rent reserved, that is, in the proportion that 7500 bears to 100,000 ; and that this reduction applies to the per capita of $7.62½ for each fur seal skin taken and shipped by it, as well as to the $60,000 annual rental. On this theory, the company tendered to the United States, before action brought, the sum of $23,789.50, being $15,000 for the tax on 7500 skins; $4500, three fortieths of the annual rental; and $4289.50, three fortieths of the full royalty on the skins.

The latter branch of this contention may be dismissed at once as untenable. By the terms of the lease, the per capita of seven dollars sixty-two and one half cents for each and every skin was not a part of the annual rental. The lease is explicit that the annual rental is the sum of $60,000, and that in addition the lessee shall pay the revenue duty of two dollars per skin, and also pay the further sum of this royalty on each and every skin. United States bonds were to be deposited " to secure the prompt payment of the sixty thousand dollars rental above referred to," and " the annual rental, together with all other payments to the United States provided for in this lease," was to be paid on or before the first of April of each and every year.

We think the rent reserved as such was this specified annual rental, and that the per capita payment was in the nature of a bonus in the sense of an addition to the stated consideration.

The Secretary was to lease to the best advantage to the United States, and that included the right to accept an offer of this kind; and while the per capita was a part of the return to the Government, it does not follow that the provision for reduction had reference to anything else than the specific rental, nor is any other construction compelled by the fact that the per capita might exceed the rental. Natural causes might diminish the catch so that this would not be so, and, at all events, the construction of the words of the statute and contract cannot be controlled by the amount of the reduction in one view rather than the other. Of course at the time the lease was made it is evident that it was supposed that sixty thousand seals might be taken annually, and on that basis the per capita royalty would be the principal compensation of the Government. This made it directly to the interest of the Government to allow the largest possible catch, which was undoubtedly a reason for the offer of the lessee in that form, as it tended to induce great circumspection in prescribing any limitation.

On the other hand, it may be that each seal would cost more as the number taken was less, and that, if the price of skins did not keep up, the company might be subjected to a loss, no matter how many it took, and the loss might be greater the more it took. But that was a risk the company assumed, and no reason is perceived for relieving it from the consequences.

The reduction of what the company agreed to pay, so far as the per capita was concerned, regulated itself. The smaller the number of skins, the less the company would pay, the larger the number, the more. We conclude that there is no adequate ground for holding that there should be any reduction on the per capita, which necessarily had to be paid.

By section 1962 of the Revised Statutes it was provided, as it had been by section three of the act of 1870, that for the period of twenty years from July 1, 1870, the number of fur seals which might be killed for their skins on the island of St. Paul was limited to 75,000 per annum, and the number which might be killed on the island of St. George to 25,000;

but the Secretary of the Treasury might limit the right of killing if it became necessary for the preservation of such seals, " with such proportionate reduction of the rents reserved to the Government as may be proper."

By section five of the act of 1870, that at the expiration of the first term of twenty years, or its termination by surrender or forfeiture, other leases might be made " in manner as aforesaid, for other terms of twenty years;" and by section 1963 of the Revised Statutes, that, when the first lease, or any future similar lease, expired, or was surrendered, forfeited or terminated, the Secretary should again lease for the term of twenty years.

It is argued with great force on behalf of the Government that whether reference be had to the act of 1870, or to the Revised Statutes, the limitation of the maximum number was expressly made only for a period of twenty years from July 1, 1870; that that limitation determined with the expiration of that period, and that consequently the provision for a proportionate reduction of rental in case of a limitation by the Secretary did not afterwards apply. But, taking the entire legislation into consideration, as we may, and indeed must, in accordance with well-settled rules of construction, when interpretation results in fairly differing meanings, *United States* v. *Lacher*, 134 U. S. 624, 626 ; *Barrett* v. *United States*, 169 U. S. 218, 227, we are not persuaded that this position is correct.

In giving authority to make the first lease, by section four of the act of 1870 the character of the lease was described, and a provision for further leases was made in section five, which referred back to the description in section four by saying that other leases might be made, " in manner as aforesaid for other terms of twenty years." When, however, the statutes were revised, the first lease had been executed and was running, and the words " in manner as aforesaid " were eliminated. The provision for succeeding leases was made the subject of section 1963, and, in declaring what they should be, the same language was used as that employed in the original act, whereby the character of future leases was indicated.

And section 1968, taken from the latter part of section five of the act of 1870, provided for the forfeiture of all the skins "if any person or company, under any lease herein authorized, knowingly kills, or permits to be killed, any number of seals exceeding the number for each island in this chapter prescribed."

It is said that the words "under any lease herein authorized" were intended to apply to the then pending lease, and that the purpose of the section was to provide for a forfeiture against any new lessee who might come in under a lease made on the happening of either of the contingencies mentioned in section 1963, as applied to the first lease, but we think the operation of the section was not intended to be thus restrained, and that it referred to any lease authorized under the chapter, and applied the forfeiture to the killing of seals in excess of the maximum number prescribed, which was to remain, if, when the time arrived for a new bidding, no change had been made by Congress.

The revision of the statutes was approved June 22, 1874, but by the last section, section 5601, provision was made that legislation between December 1, 1873, and the date of enactment should take effect as if passed subsequently.

Accordingly the act of May 24, 1874, operated by way of amendment, and by authorizing the Secretary to designate the months during which seals might be taken and the number to be taken on or about each island respectively, removed the restrictions imposed by sections 1960 and 1962 in those regards. The next day after the approval of the act, the then Secretary availed himself of it by entering into an agreement with the company that the lease of 1870 should be amended so as to provide that not more than 90,000 seals should be killed per annum on the island of St. Paul, and not more than 10,000 on the island of St. George, and that no seals should be killed in any other month except the months of June, July, August to the 15th, September and October. It seems to us reasonably clear that the specific restriction as to number, which, with the other restriction as to the months, it was the object of the act to remove, had relation to the dis-

tribution as between the two islands "respectively," and if it were proper to resort to what passed in Congress no doubt could be entertained on the subject. When the bill was reported from the Committee on Commerce no written report was made, but its purpose and scope were explained on behalf of that committee in each house and those explanations declared the object to be as above indicated.

Although the authority conferred as to the times of killing and the number to be killed was continuing and discretionary, and although the company in the present lease covenanted that it would not kill in any year a greater number than was authorized by the Secretary, yet we think it would be going much too far to hold that the original provision for a maximum number, and a proportionate reduction of the fixed rental in case of a limitation, was done away with by implication.

Repeals where the intention to do so is not expressed are not favored, and, moreover, here the mischiefs sought to be remedied are quite obvious. One was that it was evidently thought that seals might properly be taken during the first half of August, and the existing statute forbade this; the other was, that the maximum was fixed for each island, whereas it had probably been ascertained that the distribution was erroneous, or that the numbers that might be safely taken on one or the other might vary, and consequently that greater elasticity was desirable. The language by which these objects were attained was entirely reconcilable with the prior law so far as it did not purport to change it.

The legislation from the beginning was directed to the preservation of the fur seals, and the act of 1870 recognized that it might be necessary to such preservation that the number to be killed in the different years should be varied, and the discretion to do this was vested in the Secretary, but while this authority was made more comprehensive by the act of 1874, and a redistribution as between the two islands authorized, we cannot accept the view that it was the intention by that act to wholly change the scheme of leasing by making the discretion of the Secretary purely arbitrary, and dispensing with any maximum or reduction.

It should be added that the action of the Treasury Department in the matter of the abatement of rent for 1890, 1891 and 1892 does not impress us as amounting to such departmental construction as entitles it to any particular weight, and the views of the Department of Justice were conflicting.

Reference is made to Article V of the treaty of 1892 extending the *modus vivendi* and the action taken under it before the Tribunal of Arbitration, as if amounting to an estoppel, or an admission against interest, or at the least as having some considerable bearing on the construction of the lease and the statutes. That article provided, among other things, that " if the result of the arbitration shall be to deny the right of British sealers to take seals within the said waters, then compensation shall be made by Great Britain to the United States (for itself, its citizens and lessees) for this agreement to limit the island catch to seven thousand five hundred a season, upon the basis of the difference between this number and such larger catch as in the opinion of the arbitrators might have been taken without an undue diminution of the seal herds." And it appears that the United States originally presented as part of its case a claim for the recovery of the damages which it and its lessee had sustained by reason of the limitation to 7500, but this claim was certainly not presented as a claim which the company could maintain against the United States under the lease, and it involved no question of the power of the Secretary in respect of the lessee under the covenants of that instrument. There was no element of estoppel about the transaction, and counsel had no authority to bind the Government for any other purpose than the pending cause.

Moreover, counsel for the United States were constrained to expressly admit that the evidence failed to establish that an additional take over and above the seventy-five hundred could have been safely allowed. In the argument on behalf of the United States, Judge Blodgett, one of the counsel, and all the counsel concurred, made this statement: " Frankness requires us, as we think, to say that the proofs which appear in the counter case of the United States as to the condition of the seal herd on the Pribiloff Islands show that the United

States could not have allowed its lessees to have much, if any, exceeded the number of skins allowed by the *modus vivendi* of 1892 without an undue diminution of the seal herd, and upon this branch of the case we simply call the attention of the tribunal to the proofs, and submit the question to its decision." And later, counsel announced that the United States would not ask the tribunal for any finding for damages upon and under Article V.

Our opinion is, that, assuming that the lessee took all the risk of a catch, reduced by natural causes, yet that when the number that might be killed was limited by the act of the Government or its agent, the Secretary, the company was entitled to such reduction on the rental reserved as might be proper, and that the rule to be observed in that regard would be a reduction in the same proportion as the number of skins permitted to be taken bore to the maximum. This would reduce the annual rental for the year under consideration from $60,000 to $4500; the tax due would be $15,000, and the per capita $57,187.50, making a total of $76,687.50.

2. Laying out of view the concession under the first proposition, the company further contended that the prohibition by the United States, by agreement with Great Britain, of seal killing in excess of 7500, to be taken on the islands for the subsistence of the natives, relieved the company from its covenants for the payment of rent and royalty, and that no action could be maintained therefor on the lease.

The evidence disclosed that prior to 1890 the number of seals annually resorting to these islands was rapidly diminishing. This was attributed to the open sea or pelagic sealing, whereby the seals, especially the females, who were exempt from slaughter under the laws of the United States, were interrupted in their passage to the islands by the crews of foreign vessels and were killed in great numbers while in the water. For several years the United States, asserting that it had territorial jurisdiction over Behring Sea, had been striving to prevent vessels of foreign nations from seal hunting on the open waters thereof. Great Britain denied the territorial jurisdiction of the United States and denied that the United States

had a right of property in the fur seals while on the high seas during their progress to or from the islands of St. Paul and St. George, and it became necessary to resort to international regulation to prevent the extermination of the seals.   Indeed, it appears that the treasury agent in charge made a report to the Secretary of the Treasury after the season of 1890, in which he strenuously urged the necessity of stopping sealing for a number of years absolutely upon the islands as a neces-sary measure for the preservation of the seals.   On the 15th of June, 1891, an agreement for a *modus vivendi* was con-cluded between the Government of the United States and the Government of Her Britannic Majesty, " in relation to the Fur Seal Fisheries in Behring Sea," (27 Stat. 980,) whereby with a view to promote the friendly settlement of the ques-tions between the two Governments touching their respective rights in Behring Sea, " and for the preservation of the seal species," it was agreed that seal killing should be prohibited until the following May, altogether by Great Britain, and by the United States, " in excess of seventy-five hundred, to be taken on the islands for the subsistence and care of the natives."   This was followed by a convention submitting to arbitration the questions concerning the jurisdictional rights of the United States in Behring Sea; " the preservation of the fur seal in, or habitually resorting to, the said sea," and the right to take such seals, which was proclaimed May 9, 1892.   27 Stat. 947.

And under the same date the *modus vivendi* was renewed during the pendency of the arbitration.   27 Stat. 952.

The arbitral tribunal sat in Paris in 1892–3, and the pro-hibition covered the killing period for which recovery is sought in this case.

The learned Circuit Judge held that the limitation under the *modus vivendi* was not a designation by the Secretary, but was a prohibition by the Government; and, consequently, that if the lessees had not received any skins the action could not have been maintained.   But he held that as the seventy-five hundred skins were received by the lessees they must make compensation for them; that a proper way to deter-

mine this was to ascertain what the fair product of the year, which might safely be taken, was, and compute what each skin would have cost the company, assuming they had taken that number; and by this mode of computation, having found that 20,000 might properly have been taken, he reached the sum of $94,687.50 as the amount due to the Government.

The Circuit Court found that the United States, pursuant to the *modus vivendi*, "prohibited and prevented the said company from taking any seals whatever from the said islands during the year 1893, and thus deprived the said defendant of the benefit of its said lease." We think this so far partakes of a conclusion of law that we are not shut up to treating it as a finding of fact. The power to regulate the seal fisheries in the interest of the preservation of the species was a sovereign protective power, subject to which the lease was taken, and if the Government found it necessary to exercise that power to the extent which this finding asserts, and if we assume that the company might thereupon have treated this contract as rescinded, it is sufficient to say that it took no such position, but accepted the performance involved in the delivery of the seventy-five hundred skins. The company did not wish to rescind or abandon, and it could not but recognize that, as the *modus* was entered into in an effort to save the seal race from extermination, and thereby to preserve something for the future years of the lease, the prohibition was so far for its benefit.

Again, although the Government acted in making the lease by the hand of the Secretary, it was the real contracting party, exercising the power of regulation through the Secretary, so that it was immaterial whether the Secretary on his own judgment or in compliance with the will of the Government confined the number of seals taken in the year 1893 to seventy-five hundred. Undoubtedly the Government could have directed the Secretary by law to restrict the killing to seventy-five hundred seals, and the treaty was nothing more.

The company could not object that the Secretary was constrained to impose the limitation, for the Secretary was bound to obey the instructions of his principal, and the company

could not make it the subject of a contest *in pais* as to whether the preservation of the herd in fact required the limitation. The whole business of taking seals was conducted under the supervision of the Government, and by section 1973 the Secretary was authorized to appoint agents, who were charged with the management of the seal fisheries.

The record shows that instructions were issued to the Government supervising agent on April 26, 1893, and a copy delivered to the superintendent of the company before the commencement of the season of that year. These instructions directed the number of seals to be taken during the season of 1893 to be limited to 7500. It was stated by the Secretary that it was believed: "That if the killing be confined between the first of June and the tenth of August, a better quality of skins would be obtained and less injury would be done to the rookeries;" and he added: "This matter is, however, left, as above stated, to your discretion, and in reference thereto you will confer fully with the representative of the company, its interests and those of the Government in the preservation of the fur seals being identical."

In the letter of the attorney of the company of November 15, 1893, he said: "During the present year this company, in strict compliance with the orders of the Treasury Department, restricted its catch to 7500." In other words, it appears that both parties regarded the Secretary of the Treasury as authorizing the taking of 7500 skins in the year 1893.

Under the law of 1870 and the various sections of the Revised Statutes the power was expressly reserved to the Government to make whatever restrictions of the business it might see fit to make; the lease recognized this to the full extent; and it was, moreover, expressly stipulated that the company was not to kill or permit to be killed a greater number than the Secretary might authorize. The company was offered 7500 skins for 1893; took them; paid the amount fixed by the Secretary under the lease for compensation to the natives for taking and loading the skins, and subsequently tendered the sum of $23,789.50 as, according to its computation, the full amount due under the lease. These particular

seals were killed by the Government agent, but notice of the killing, from time to time, was given to the company, and the company requested to select the skins it desired, which it did. The Government did not regard the lease as broken, but proceeded under it, and delivered the 7500 skins as full performance of the covenant on its part, for the privilege of taking the seals was subject to such limitation on the number as the Government believed it necessary to impose; and the company acquiesced in that view by taking the 7500 skins without dissent.

It was after this that the question arose, not of breach of contract, but as to what sum, if any, was due from the company under the lease more than it had tendered. Was the company entitled to a reduction on what it had agreed to pay, and, if so, how much?

3. Finally, the company claims that the United States are liable to it in damages to the extent of $287,725, for skins it could have taken during the season of 1893, without unreasonable injury to or diminution of the seal herd, and which the United States prevented it from doing; and that it can avail itself of this claim in this suit by way of recoupment and counterclaim.

The Circuit Court rejected this counterclaim on the ground that the claim had not been presented and disallowed by the accounting officers of the Treasury, and dismissed it, not on the merits, but without prejudice. The company prosecuted its writ of error from the Circuit Court of Appeals for the Second Circuit, and assigned as errors, among others, that the Circuit Court erred in adjudging that its claim for damages was not duly presented; that the court did not allow its counterclaim; and that judgment was not directed in favor of the company. From what we have already said it will have been seen that we are of opinion that the company cannot maintain this claim for damages, and that, assuming that the claim had been duly presented and disallowed, and that, if meritorious, it might be availed of by way of recoupment in this action, the Circuit Court erred in its disposition of the counterclaim.

The seal fisheries of the Pribiloff Islands were a branch of commerce and their regulation involved the exercise of power as a sovereign and not as a mere proprietor. Such governmental powers cannot be contracted away, and it is absurd to argue that in this instance there was any attempt to do so, or any sheer oppression or wrong inflicted on the lessee by the Government in the effort to protect the fur seal from extinction.

The privilege leased was the exclusive right to take fur seal, but it was subject, and expressly subjected, from the beginning, to whatever regulations of the business the United States might make. If those regulations reduced the catch, the company was protected by a reduction of the rental, and paid taxes and per capita only on the number taken. The other expenses to which it bound itself were part of the risk of the venture. The catch for 1893 was lawfully limited to seventy-five hundred, and the company accepted and disposed of the skins. It cannot now be heard to insist that that limitation was in breach of the obligations of the Government, for which, though still claiming the contract to be outstanding, it is entitled to recover damages.

*The judgment of the Circuit Court is reversed and the cause remanded with a direction to enter judgment in favor of the United States for $76,687.50, with interest from the first day of April, 1894; and to enter judgment in favor of the United States on the counterclaim.*