## UNITED STATES *v.* HEALEY.

### APPEAL FROM THE COURT OF CLAIMS.

No. 378.   Argued October 22, 23, 1895. — Decided December 2, 1895.

The act of March 3, 1877, c. 107, 19 Stat. 377, providing for the sale of desert lands in certain States and Territories, does not embrace alternate sections, reserved to the United States, along the lines of railroads for the construction of which Congress has made grants of lands.

Cases initiated under that act, but not completed, by final proof, until after the passage of the act of March 3, 1891, c. 561, 26 Stat. 1095, were left by the latter act, as to the price to be paid for the lands entered, to be governed by the law in force at the time the entry was made.

When the practice in a department in interpreting a statute is uniform, and the meaning of the statute, upon examination, is found to be doubtful or obscure, this court will accept the interpretation by the department as the true one; but where the departmental practice has not been uniform, the court must determine for itself what is the true interpretation.

THE case is stated in the opinion.

*Mr. Assistant Attorney General Dodge* for appellant. *Mr. George H. Gorman* was on his brief.

*Mr. Harvey Spaulding* for appellee.

MR. JUSTICE HARLAN delivered the opinion of the court.

On the 5th day of February, 1889, the appellant, Benjamin Healey, filed in the local land office at Visalia, California, a declaration of his intention to reclaim a tract of land containing 639.20 acres, and belonging to the United States.

The declaration stated all the facts required in the cases embraced by the act of Congress of March 3, 1877, c. 107, providing for the sale of "desert lands" in certain States and Territories.   19 Stat. 377; Supp. Rev. Stat. 2d ed. 137.   That act fixed $1.25 per acre as the price of such lands.

The lands described in the declaration constituted one of the alternate reserved sections of public lands reserved to the United States, along the line of the railroad extending from the States of Missouri and Arkansas to the Pacific coast, for the construction of which provision was made by the act of Congress of July 27, 1866, c. 278, 14 Stat. 292, 294.

At the time of filing his declaration the plaintiff — "being so required, without protest and without taking any steps for relief against the demand of the receiver" — paid the sum of $319.60, or 50 cents per acre, for the lands described. He made, September 21, 1891, satisfactory proof of the reclamation of the tract in question and, without protest, paid for the land reclaimed, in addition to the amount paid at the time of filing his declaration, the sum of $1278.40, or $2 per acre; in all, $2.50 per acre. A patent was thereupon issued to him.

This action was brought against the United States to recover the sum of $799, which amount, it is claimed, was in excess of what the receiver was entitled to demand from the appellee — his contention being that the statute only required the payment of 25 cents per acre at the time of filing his declaration, and $1 per acre more when making his final proof; in all, $1.25 per acre.

The Court of Claims sustained this demand, and gave judgment in favor of the appellee for $799.

An examination of the statutes regulating the sale of the public lands is necessary in order to determine the question now presented. That question is, whether the act of 1877, providing for the sale of "desert lands," embraces alternate sections reserved to the United States, along the line of railroads for the construction of which Congress made a grant of lands.

By the act of April 24, 1820, making further provision for the sale of the public lands, 3 Stat. 566, c. 51, it was provided that from and after the first day of July thereafter no lands should be sold, either at public or private sale, for less than one dollar and twenty-five cents an acre.

The next act referred to in the opinion of the Court of Claims is that of September 4, 1841, c. 16, appropriating the

proceeds of the sales of the public lands and granting pre-emption rights.   5 Stat. 453, 455.   That act allowed every person of the class described in it to enter not exceeding one hundred and sixty acres or one quarter-section of public land, upon paying the minimum price therefor, subject, however, to certain limitations and exceptions, one of which was that "no sections of land reserved to the United States alternate to other sections granted to any of the States for the construction of any canal, railroad, or other public improvement" should be liable to entry under that act.   § 10.

By the act of March 3, 1853, c. 143, the preëmption laws of the United States, as they then existed, were extended over the alternate reserved sections of public lands along the lines of all railroads for the construction of which public lands had been or might thereafter be granted by acts of Congress.   But that act contained a proviso declaring that "the price to be paid shall in all cases be $2.50 per acre, or such other minimum price as is now fixed by law or may be fixed upon lands hereafter granted."   10 Stat. 244.

Other enactments show that Congress steadily held to the policy of requiring double the minimum price for alternate sections of public lands reserved to the United States in grants to aid in the construction of railroads.   In the first grant of this character — that of September 20, 1850, to the States of Illinois, Mississippi, and Alabama of alternate even-numbered sections in aid of the construction of a railroad from Chicago to Mobile — it was provided "that the sections and parts of sections of land which, by such grant, shall remain to the United States, within six miles on each side of said road and branches, shall not be sold for less than double the minimum price of the public lands when sold."   9 Stat. 466, c. 61, § 3. A similar provision will be found in nearly all, if not in all, subsequent acts making grants of public lands for the construction of railroads.[1]

---

[1] 1852, 10 Stat. 8, c. 45, § 2; 1853, id. p. 155, c. 59, § 3; 1856, 11 Stat. 9, c. 28, § 2; id. p. 15, c. 31, § 16; id. p. 17, c. 41, § 2; id. p. 18, c. 42, § 2; id. p. 20, c. 43, § 2; id. p. 21, c. 44, § 2; id. p. 30, c. 83, § 2; 1857, id. p. 195, c. 99, § 2; 1863, 12 Stat. 772, c. 98, § 2; 1864, 13 Stat. 66, c. 80, § 4; id. p.

An examination of these acts makes it clear that up to the revision of the statutes of the United States, it was the settled policy of the government to hold for sale, at a price not less than double the minimum price of public lands, all alternate reserved sections on the lines of railroads constructed with the aid of the United States.

That policy was recognized in section 2357 of the Revised Statutes, which provides that "the price at which the public lands are offered for sale shall be one dollar and twenty-five cents an acre; and at every public sale, the highest bidder, who makes payment as provided in the preceding section, shall be the purchaser; but no land shall be sold, either at public or private sale, for a less price than one dollar and twenty-five cents an acre; and all the public lands which are hereafter offered at public sale, according to law, and remain unsold at the close of such public sales, shall be subject to be sold at private sale, by entry at the land office, at one dollar and twenty-five cents an acre, to be paid at the time of making such entry: *Provided,* That the price to be paid *for alternate reserved lands, along the line of railroads within the limits granted by any act of Congress,* shall be two dollars and fifty cents per acre."

It is to be observed, in passing, that this proviso applies to all alternate reserved lands described in any act of Congress, and makes no exception of any lands of that class on account of their fitness or unfitness, in their natural condition, for agricultural purposes.

Thus the law stood at the date of the act of March 3, 1877, c. 107, providing for the sale of "desert lands" in certain States and Territories. 19 Stat. 377, c. 107. That act is as follows:

"That it shall be lawful for any citizen of the United States, or any person of requisite age ' who may be entitled to become a citizen, and who has filed his declaration to be-

72, c. 84, § 2; id. p. 365, c. 217, § 6; 1865, id. p. 526, c. 105, § 4; 1866, 14 Stat. 83, c. 165, § 3; id. p. 87, c. 168, § 2; id. p. 94, c. 182, § 5; id. p. 210, c. 212, § 2; id. p. 236, c. 241, § 2; id. 239, c. 242, § 2; 1867, id. p. 548, c. 189, § 5; 1870, 16 Stat. 94, c. 69, § 4.

come such' and upon payment of twenty-five cents per acre — to file a declaration under oath with the register and the receiver of the land district in which any desert land is situated, that he intends to reclaim a tract of desert land not exceeding one section, by conducting water upon the same, within the period of three years thereafter: *Provided, however*, That the right to the use of water by the person so conducting the same, on or to any tract of desert land of six hundred and forty acres shall depend upon *bona fide* prior appropriation: and such right shall not exceed the amount of water actually appropriated, and necessarily used for the purpose of irrigation and reclamation: and all surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers and other sources of water supply upon the public lands and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining, and manufacturing purposes subject to existing rights. Said declaration shall describe particularly said section of land if surveyed, and, if unsurveyed, shall describe the same as nearly as possible without a survey. At any time within the period of three years after filing said declaration, upon making satisfactory proof to the register and receiver of the reclamation of said tract of land in the manner aforesaid, and upon the payment to the receiver of the additional sum of one dollar per acre for a tract of land not exceeding six hundred and forty acres to any one person, a patent for the same shall be issued to him: *Provided*, That no person shall be permitted to enter more than one tract of land and not to exceed six hundred and forty acres which shall be in compact form.

" SECTION 2. That all lands exclusive of timber lands and mineral lands which will not, without irrigation, produce some agricultural crop, shall be deemed desert lands, within the meaning of this act, which fact shall be ascertained by proof of two or more credible witnesses under oath, whose affidavits shall be filed in the land office in which said tract of land may be situated.

" SECTION 3. That this act shall only apply to and take

effect in the States of California, Oregon, and Nevada, and the Territories of Washington, Idaho, Montana, Utah, Wyoming, Arizona, New Mexico, and Dakota, and the determination of what may be considered desert land shall be subject to the decision and regulation of the Commissioner of the General Land Office."

It is said that the administration of this act by the Interior Department for many years succeeding its passage was upon the theory that "desert lands" (unless they were timber and mineral lands) included all public lands in the States and Territories named that required irrigation — even if they were alternate reserved sections along the lines of land-grant railroads. The object of this suggestion is to bring the present case within the rule, often announced, that when the meaning of a statute is doubtful great weight should be given to the construction placed upon it by the Department charged with its execution, where that construction has, for many years, controlled the conduct of the public business. *Edwards* v. *Darby*, 12 Wheat. 206; *United States* v. *Philbrick*, 120 U. S. 52, 59; *Robertson* v. *Downing*, 127 U. S. 607, 613.

Let us see what has been the practice in the Interior Department in cases arising, or which have been treated as having arisen, under the act of 1877.

As soon as that act was passed, the Commissioner of the Land Office issued a circular, addressed to the registers and receivers of land offices, in which he said that, after the applicant for a patent for "desert lands" had made the required proof, the officer should receive from him the sum of twenty-five cents per acre for the land applied for, and after the expiration of the period named in the statute, and upon proof that water had been conducted upon the land, he should receive the additional payment of one dollar per acre. But it does not appear that the Commissioner intended to make any ruling upon the specific question whether the act of 1877 embraced alternate reserved sections along the line of land-grant railroads. No reference is made by him to the proviso of section 2357 of the Revised Statutes. Nevertheless, for many years after the passage of the act of 1877 it was held

in the Department that "lands entered under that act should be paid for at the rate of $1.25 per acre without regard to railroad limits." 14 Land Dec. 75.

But the precise question before the court was considered by the Land Office at a later date and a new policy was inaugurated. In a circular from that office, of date June 27, 1887, it was distinctly stated that "the price at which lands may be entered under the desert land act is the same as under the preemption law, viz., single minimum lands at $1.25 per acre, and double minimum lands at $2.50 per acre" — the Commissioner referring, in his circular, to section 2357 of the Revised Statutes as his authority for that regulation. That circular received the approval of Secretary Lamar. 5 Land Dec. 708. 712.

In *Tilton's case*, decided March 25, 1889, the point was made that the desert land act of 1877, being subsequent in point of time to section 2357, must control as to *all* lands that required irrigation. Secretary Noble, after observing that these statutes were parts of one general system of laws regulating the disposal of the public domain, and, therefore, to be regarded as explanatory of each other and to be construed as if they were one law, said : "Under such construction, section 2357 of the Revised Statutes and the desert land act do not conflict; but each has a separate and appropriate field of operation ; the former, regulating the price of desert lands reserved to the United States along railway lines ; and the latter, the price of other desert lands not so located. There is nothing in the nature of the case which renders it proper that desert lands be made an exception to the general rule any more than lands entered under the preëmption laws. Lands reserved to the United States along the line of railroads are made double minimum in price because of their enhanced value in consequence of the proximity of such roads. Desert lands subject to reclamation are as much liable to be increased in value by proximity to railroads as any other class of lands, and hence the reason of the law applies to them as well as to other public lands made double minimum in price. To hold desert lands an exception to the general rule regulating

the price of lands reserved along the lines of railroads, would be to make the laws on this subject inharmonious and incon-sistent." 8 Land Dec. 368, 369. The same ruling was made by the Interior Department July 2, 1889, in *Knaggs'* case, the Secretary saying that "the Department construes the desert land act as fixing the price of desert land within railroad limits at two dollars and fifty cents an acre." 9 Land Dec. 49, 50. A like decision was made in *Wheeler's case*, August 16, 1889, and in *Reese's case*, May 9, 1890. 9 Land Dec. 271; 10 Land Dec. 541.

This brings us to the act of Congress of March 3, 1891, entitled "An act to repeal timber-culture laws, and for other purposes." 26 Stat. 1095, c. 561.

The second section of that act provides that the above act of 1877, providing for the sale of desert lands in certain States and Territories, "is hereby amended by adding thereto the following sections." Then follow five sections, numbered four to eight inclusive, which were added to the statute of 1877. Sections 6 and 7 of the sections so added to the act of 1877 are in these words:

"Sec. 6. That this act shall not affect any valid rights heretofore accrued under said act of March third, eighteen hundred and seventy-seven, but all *bona fide* claims heretofore lawfully initiated may be perfected, upon due compliance with the provisions of said act, in the same manner, upon the same terms and conditions, and subject to the same limitations, forfeitures, and contests as if this act had not been passed; or said claims, at the option of the claimant, may be perfected and patented, under the provisions of said act, as amended by this act, so far as applicable; and all acts and parts of acts in conflict with this act are hereby repealed.

"Sec. 7. That at any time after filing the declaration, and within the period of four years thereafter, upon making satisfactory proof to the register and receiver of the reclamation and cultivation of said land to the extent and cost and in the manner aforesaid, and substantially in accordance with the plans herein provided for, and that he or she is a citizen of the United States, and upon payment to the receiver of the

additional sum of one dollar per acre for said land, a patent shall issue therefor to the applicant or his assigns; but no person or association of persons shall hold by assignment or otherwise prior to the issue of patent, more than three hundred and twenty acres of such arid or desert lands; but this section shall not apply to entries made or initiated prior to the approval of this act. . . ."

In *Gardiner's Case*, 1894, 19 Land Dec. 83 — which was the case of an entry made in 1889, the final proof, however, not being furnished until after the passage of the act of 1891 — the present Secretary referred to the above seventh section of the act of 1891, and to the decision of Secretary Noble in 14 Land Dec. 74, and said:

"This section operates upon entries then existing, as well as upon subsequent entries of desert land. It contains the following language: 'But no person or association of persons shall hold by assignment or otherwise prior to the issue of patent more than three hundred and twenty acres of such arid or desert lands; but this section shall not apply to entries made or initiated prior to the approval of this act.' The words, 'but this *section*,' do not, in my opinion, relate to the provisions of the entire section, but do relate simply to the quantity of lands which one person could thereafter enter, and the word 'section,' in the above act quoted, should be construed to mean 'provision.' It would then read: 'But this *provision* shall not apply to entries made prior to the passage of this act.' This is manifest, in my judgment, from the fact that the act of 1891 is similar to the act of 1877 — of which the act of 1891 was amendatory — in reference to the price to be paid for desert lands, and it amends the act of 1877 as to the quantity of land that could be entered by any one person or association of persons. Evidently the words above quoted, taken from the act of 1891, were intended by Congress to limit the operation of the act to entries *thereafter* to be made, as to the quantity of land, and saved all entries *theretofore* made, as to the quantity of land; but it was not intended to limit the benefits as to price to such entries as might be made subsequently to the date of the passage of the act. The

declaration in this case was made March 11, 1889; and before reclamation was completed as required by the statute, the act of 1891 was passed, which, as construed by Secretary Noble, fixed the price at one dollar and a quarter per acre, regardless of location. Construing the act as I do, as to the price the entryman should be required to pay for desert land, I am of opinion that this entryman should be allowed to purchase at one dollar and a quarter per acre."

A similar ruling was made (1895) in *Organ's Case*, 20 Land Dec. 406.

From this review of the administration by the Interior Department of the act of 1877, it appears that, for ten years after the passage of that act, "desert lands," even if they were alternate reserved sections along the lines of land-grant railroads, could be obtained from the government at the price of $1.25 per acre; that after June 27, 1887, and until the passage of the act of March 3, 1891, c. 561, the act of 1877 was administered upon the theory that it did not modify or conflict with section 2357 of the Revised Statutes, and therefore did not include alternate sections reserved to the United States along the line of land-grant railroads, the price for which was fixed at $2.50 per acre; that the act of 1891 was interpreted to mean *all* desert lands, those within as well as those without the granted limits of a railroad, and to authorize their sale at $1.25 per acre; and that cases *initiated* under the act of 1877 should, in respect to price per acre of lands, be completed according to the terms prescribed by the act of 1891.

If, prior to the passage of the act of 1891, the Interior Department had uniformly interpreted the act of 1877 as reducing the price of alternate reserved sections of land along the lines of land-grant railroads, being desert lands, from $2.50 to $1.25 per acre, we should accept that interpretation as the true one, if, upon examining the statute, we found its meaning to be at all doubtful or obscure. But as the practice of the Department has not been uniform, we deem it our duty to determine the true interpretation of the act of 1877, without reference to the practice in the Department.

Did the act of 1877 supersede or modify the proviso of sec

tion 2357 of the Revised Statutes, which expressly declared that the price to be paid for alternate reserved lands along the line of railroads, within the limits defined by any act of Congress, should be two dollars and fifty cents per acre?

The principal, if not the only, object of the requirement that the alternate reserved sections along the lines of land-grant railroads should not be sold for less than double the minimum price fixed for other public lands, was to compensate the United States for the loss of the sections given away by the government.

The act of 1877 and the proviso of section 2357 of the Revised Statutes both relate to public lands; the former, to desert lands, that is, such lands — not timber and mineral lands — as required irrigation in order to produce agricultural crops, and the price for which was $1.25 per acre; the latter, to such lands, along the line of railroads, as were reserved to the United States in any grant made by Congress, and the price for which was $2.50 per acre. As the statute last enacted contains no words of repeal, and as repeals of statutes by implication merely are never favored, our duty is to give effect to both the old and new statute, if that can be done consistently with the words employed by Congress in each. We perceive no difficulty in holding that the desert lands referred to in the act of 1877 are those in the States and Territories specified, which required irrigation before they could be used for agricultural purposes, but which were not alternate sections reserved by Congress in a railroad land grant. It is as if the act of 1877, in terms, excepted from its operation such lands as are described in the proviso of section 2357 of the Revised Statutes. Thus construed, both statutes can be given the fullest effect which the words of each necessarily require. In the absence of some declaration that Congress intended to modify the long-established policy indicated by the proviso of section 2357 of the Revised Statutes, we ought not to suppose that there was any purpose to except from that proviso any public lands of the kind therein described, even if, without irrigation they were unprofitable for agricultural purposes. To hold that alternate sections along the lines of a railroad

aided by a grant of public lands, being also desert lands, could be obtained, under the act of 1877, at one dollar and twenty-five cents an acre, would be to modify the previous law by implication merely. In *Frost* v. *Wenie,* 157 U. S. 46, 58, we said: "It is well settled that repeals by implication are not to be favored. And where two statutes cover, in whole or in part, the same matter, and are not absolutely irreconcilable, the duty of the court — no purpose to repeal being clearly expressed or indicated — is, if possible, to give effect to both. In other words, it must not be supposed that the legislature intended by a statute to repeal a prior one on the same subject, unless the last statute is so broad in its terms and so clear and explicit in its words as to show that it was intended to cover the whole subject, and, therefore, to displace the prior statute."

Giving effect to these rules of interpretation, we hold that Secretaries Lamar and Noble properly decided that the act of 1877 did not supersede the proviso of section 2357 of the Revised Statutes, and, therefore, did not embrace alternate sections reserved to the United States by a railroad land grant.

It results that prior to the passage of the act of 1891, lands such as those here in suit, although within the general description of desert lands, could not properly be disposed of at less than $2.50 per acre. Was a different rule prescribed by that act in relation to entries made previously to its passage?

If it be true, as seems to have been held by the Interior Department, that the act of 1877, as amended by that of 1891, embraces alternate reserved sections along the lines of land-grant railroads that require irrigation in order to fit them for agricultural purposes — upon which question we express no opinion — it is necessary to determine whether a case begun, as this one was, prior to the passage of the act of 1891 is controlled by the law as it was when the original entry was made. This question is important in view of the fact that the appellee's entry was made under the act of 1877, before it was amended, and his final proof was made after the act of 1891 took effect.

The present Secretary of the Interior, as we have seen, held that entries initiated under the act of 1877 and prior to the act of 1891 could be completed upon the terms fixed by the latter act as to price of desert lands. If that construction be correct, and if the plaintiff is not precluded from recovering money voluntarily paid by him, with full knowledge of all the facts, then the judgment below was right. Otherwise, it must be reversed.

We are of opinion that the act of 1891 did not authorize the lands in dispute to be sold at $1.25 per acre, where, as in this case, the proceedings to obtain them were begun before its passage.

Although the act of 1891 was, in some particulars, clumsily drawn, it is manifest that the words "this act," in the section added by it to the act of 1877 and numbered six, refer to the act of 1891, and that the words "said act" refer to the act of 1877. It is equally clear that the purpose of that section, thus added to the former act, was to preserve the right to perfect all *bona fide* claims "lawfully initiated" under the act of 1877, and "upon the same terms and conditions" as were prescribed in that act. It is true that the claimant, at his option, could perfect his claim, thus initiated, and have the lands patented under the act of 1877, as amended by that of 1891, so far as the latter act was applicable to the case. But this did not mean that land entered under the act of 1877, when the price was $2.50 per acre, could be patented, after the passage of the act of 1891, upon paying only $1.25 per acre.

If any doubt could exist as to the object of section six, added by the act of 1891 to the act of 1877 — to which section the attention of the present Secretary seems not to have been drawn — that doubt must be removed by the explicit language of added section seven. The latter section fixes the price of desert lands at $1.25 per acre, and declares that "this *section* shall not apply to entries made or initiated prior to the approval of this act" — that is, to entries made prior to the approval of the act of 1891. The Secretary construed the word "section" to mean "provision," and as referring not to the entire section, but only to the clause or provision relating

to the quantity of desert lands that any person or association of persons might appropriate.    We cannot assent to this view. The words "section" and "provision" frequently occur in the act of 1891, and there is no reason to suppose that Congress, when using the words "but this section shall not apply to entries made or initiated prior to the approval of this act," intended that only one provision or clause of that section should apply to such entries.

We are of opinion that cases initiated under the original act of 1877, but not completed, by final proof, until after the passage of the act of 1891, were left by the latter act — at least as to the price to be paid for the lands entered — to be governed by the law in force at the time the entry was made. So far as the price of the public lands was concerned, the act of 1891 did not change, but expressly declined to change, the terms and conditions that were applicable to entries made before its passage.    Such terms and conditions were expressly preserved in respect of all entries initiated before the passage of that act:

*The judgment of the Court of Claims is reversed, with directions to dismiss the claimant's petition.*