**SMITH v. BALTIMORE & O. R. CO. et al.**

No. 2493.

District Court, W. D. Pennsylvania.

March 5, 1931.

Shelby, Hackney & Ray, of Uniontown, Pa., for plaintiff.

Smith Buchanan, Scott & Gordon, of Pittsburgh, Pa., for defendant Baltimore & O. R. Co.

William A. Wilson and C. Roscoe Hoffman, both of Pittsburgh, Pa., for defendant Bank of Pittsburgh, Nat. Ass'n.

McVICAR, District Judge.

The bill of plaintiff, receiver of a national bank, prays the court to decree an agreement illegal and void between the bank and the Baltimore & Ohio Railroad Company (wherein were pledged certain assets of the

bank as security for a deposit of the railroad company); that the securities be delivered to plaintiff; and for an injunction. It is alleged therein that the bank was without power to make the agreement. The answers of the defendants deny that the agreement was ultra vires, illegal, and void, and aver that plaintiff was without power to disaffirm the contract even if ultra vires, as he had not returned, or offered to return, the deposit received.

From the written stipulation of facts of the parties, the following findings of fact are made:

## Findings of Fact.

1. On and prior to the 23d day of February, 1928, the Baltimore & Ohio Railroad Company, a corporation organized and doing business under the laws of the state of Maryland (hereinafter called "Railroad"), carried certain of its funds on deposit with the First National Bank of Connellsville, a banking association organized under the banking laws of the United States and having its principal place of business in the city of Connellsville, county of Fayette, and state of Pennsylvania (hereinafter called the "First Bank").

2. On or about February 11, 1928, the Railroad wrote the First Bank requesting that its balances on deposit from time to time be protected either by a deposit of bonds or a bond with acceptable corporate security thereon. A copy of said letter of February 11, 1928, is attached to the bill and by reference is made a part hereof.

3. Thereafter, in compliance with the request of the Railroad and to prevent the threatened withdrawal of the Railroad Company's funds on deposit, a written agreement, dated the 23d day of February, 1928 (but actually signed by the First Bank on the 24th day of February, 1928, and by the Railroad on the 7th day of March, 1928), was entered into between the First Bank and the Railroad, whereby it was agreed, in substance, that the First Bank, as security for the deposits already made or which might thereafter be made by the Railroad, would deliver to the Bank of Pittsburgh, N. A., as trustee, certain bonds and securities, listed in an exhibit attached to said agreement, of the aggregate par value of $54,000, and whereby, on the failure of the First Bank to pay any check drawn upon it by the Railroad, provided the Railroad should have on deposit sufficient funds for the payment thereof, the trustee should sell at the market price such amount of said securities as would be sufficient for the payment of said check; three days' notice of such sale to be given to the First Bank. A copy of said agreement is attached to the bill and by reference is made a part hereof.

4. This agreement was signed on behalf of the First Bank by Robert Norris, president, and attested under the corporate seal by H. C. Norton, cashier, they being the duly elected and qualified officers of the First Bank. The execution of the said agreement was authorized and approved by the board of directors of the First Bank at a meeting of said board, attended by all of the members of the board, duly convened on the 23d day of February, 1928, at which time the following preambles and resolution were unanimously adopted:

"Whereas the Baltimore & Ohio Railroad Company has on deposit in this institution this day and the sum of thirty thousand five hundred ninety-three and 39/100 ($30,593.39) dollars and has demanded security for the payment of said deposit, and for such other sums as may be deposited from time to time; and

"Whereas, this institution has agreed to deposit with the Bank of Pittsburgh, N. A., the bonds and securities hereinafter listed, of the par value of fifty four thousand ($54,-000.00) dollars, under the terms and conditions of an agreement between this institution and the Baltimore & Ohio Railroad Company, submitted and read at length at this meeting;

"Now be it Resolved, that the President and Cashier be, and they hereby are authorized, empowered and directed to execute and deliver the said agreement, and to deposit the said bonds and securities under the terms thereof, with the Bank of Pittsburgh, N. A., as provided therein."

5. Notice of the action of the directors was sent by the First Bank to the Railroad by means of the following letter, dated February 24, 1928:

"At a meeting of the Board of Directors last evening it was resolved to pledge securities of the par value of $54,000.00 to secure your deposit. Our attorneys thought there should be an agreement covering this and accordingly prepared a form; we are enclosing two copies thereof, each signed by the bank. If satisfactory to you, sign them and return one to us. If not in satisfactory form suggest changes you desire. We are taking the securities together with a copy of this agreement to the Bank of Pittsburgh, N. A., today.

"Hoping that this is satisfactory to you, we are,"

6. In pursuance of the terms of said agreement, the First Bank delivered, on or about the 24th day of February, 1928, to the Bank of Pittsburgh, N. A., the bonds and securities listed in Exhibit A attached to the agreement, Exhibit 2, of the aggregate par value of $54,000, together with a copy of said agreement, Exhibit 2 (not at that time executed by the Railroad), since which time until the present time said bonds have remained on deposit with the Bank of Pittsburgh, N. A.

7. The Bank of Pittsburgh, N. A., accepted the trust contemplated in said agreement, as appears by letter dated February 24, 1928, from the Bank of Pittsburgh, N. A., to the First National Bank of Connellsville, a copy of which is attached to the bill and by reference is made a part hereof.

8. Shortly after February 24, 1928, the said agreement, Exhibit 2, was executed by the Railroad Company. An original executed copy of said agreement of February 23, 1928, remained from that time until March 28, 1928, in the possession of the First Bank, and, from March 28, 1928, in the possession of the Citizens' National Bank of Connellsville, a banking association organized under the banking laws of the United States. The Railroad has likewise had in its possession since the execution by it of same, an original executed copy of said agreement, Exhibit 2.

9. The balances on deposit to the credit of the Railroad with the First Bank fluctuated between the dates of February 23, 1928, and March 10, 1928, having been as follows at the close of business on said respective days:

February 23, $30,593.39.
February 24, $38,900.22.
February 25, $42,637.87.
February 27, $19,087.69.
February 28, $9,111.84.
February 29, $3,950.03.
March 1, $10,461.20.
March 2, $19,668.82.
March 3, $16,608.82.
March 5, $22,636.52.
March 6, $34,388.97.
March 7, $39,574.72.
March 8, $46,064.02.
March 9, $40,000.
March 10, $40,000.

On March 10, 1928, the balance on deposit as aforesaid was $40,000, and that balance remained on deposit thereafter until the closing of the Citizens' Bank as hereinafter mentioned.

10. Deposits were made by the Railroad almost daily after March 10, 1928, but on each day deposits were made, the First Bank (until March 28, 1928) and the Citizens' Bank (after March 28, 1928), pursuant to instructions from the Railroad, would remit the amount of such deposit to the Railroad by drawing a draft on a correspondent bank, mailed to the Bank of Pittsburgh, National Association, with instructions to place the amount thereof to the credit of the Railroad.

11. On March 28, 1928, the First Bank and the Citizens' Bank entered into a written agreement whereby the First Bank assigned and transferred to the Citizens' Bank all of its assets (with certain exceptions, not material to the present suit), including the securities pledged under Exhibit 2 hereof, and the Citizens' Bank assumed and agreed to pay and discharge all of the liabilities and obligations of the First Bank. A true and correct copy of said agreement (with the exception of the schedules attached thereto) of March 28, 1928, is attached to the bill and by reference is made a part hereof.

12. The said securities as aforesaid were later absorbed by the Citizens' Bank and credited by the Citizens' Bank to the "First National Bank Asset Account," as provided for in the eighth and subsequent paragraphs of said agreement of March 28, 1928, so that the Citizens' Bank has succeeded to all the rights and obligations of the First Bank under said agreement of February 23, 1928.

13. On the morning of July 30, 1930, the amount on deposit with the Citizens' Bank to the credit of the Railroad was the sum of $40,000. On the same day, a deposit of $2,915.83 was made by the Railroad for credit to the same account. Later, on the same day, pursuant to a long-standing previous arrangement between the Citizens' Bank and the Railroad, the Citizens' Bank drew its draft No. 11839 on First National Bank of Pittsburgh, Pa., a correspondent bank, in the amount of $2,915.83, to the order of the Bank of Pittsburgh, and mailed the said draft to the Bank of Pittsburgh, with instructions to place it to the credit of the Railroad. The said deposit balance of the Railroad as shown by the books of the Citizens' Bank was thereupon reduced by the amount of the said draft, leaving the balance on deposit in the said account, as shown by the books of the Citizens' Bank

at $40,000. At the same time, the amount of the said draft was deducted from the balance due to the Citizens' Bank from the First National Bank of Pittsburgh, Pa., as shown by the Citizens' books.

14. On July 31, 1930, the Citizens' Bank was found and declared to be insolvent by the Comptroller of the Currency of the United States, and thereupon on said date the said Comptroller duly appointed Lloyd Littrell receiver of the said bank.

15. Before the said draft for $2,915.83 could be presented for payment, the Citizens' Bank had closed and a receiver appointed as aforesaid. Shortly thereafter, the said draft was presented to the First National Bank of Pittsburgh for payment, but payment was refused because of the closing of the said Citizens' Bank.

16. At the time the Citizens' Bank was closed, the amount due the Railroad was the sum of $42,915.83, represented by the balance of $40,000 in the deposit account of the Railroad as shown by the books of the Citizens' Bank, and by the amount of $2,915.83 due upon the said draft as shown by the books of the Citizens' Bank.

17. On September 25, 1930, the Railroad drew its two checks, both dated September 25, 1930, one for the sum of $40,000 and the other for the sum of $2,915.83, upon said Citizens' Bank. Said checks were promptly presented to the receiver of the Citizens' Bank for payment and demand for payment made, but payment was refused and the said checks were returned unpaid with a pencil notation thereon stating, "Bank Closed." True and correct copies of said checks are attached to the bill and by reference is made a part hereof.

18. On January 13, 1931, the Railroad gave notice to the Bank of Pittsburgh, N. A., requesting the Bank of Pittsburgh, N. A., to sell at the market price such amount of said securities deposited with said Bank of Pittsburgh, N. A., under the terms of said agreement, Exhibit 2, as would be sufficient for the payment of the two said checks, Exhibit 5 and 6. A copy of said notice is attached to the bill and by reference is made a part hereof.

19. Within three days of such notice and prior to the time that the Bank of Pittsburgh, N. A., under the terms of the agreement, Exhibit 2, aforesaid could make sale of said securities, this suit was instituted by George H. Smith, receiver for Citizens' National Bank of Connellsville, against the Bank of Pittsburgh, N. A., joining the Balti-more & Ohio Railroad Company as defendant.

20. The above-mentioned Lloyd Littrell resigned as receiver of the Citizens' Bank on August 7, 1930, whereupon the Comptroller of the Currency duly appointed George H. Smith receiver of said bank. The said Smith duly qualified as receiver of the said bank and is now acting as such receiver, winding up the affairs of the Citizens' Bank under and by virtue of the laws of the United States, under the direction of the said Comptroller.

21. At the time the Citizens' Bank was closed, there were over 11,200 depositors and other creditors of the said bank, the amount of the liabilities to the said creditors being approximately $2,800,000. The said Citizens' Bank was insolvent at the time of closing and the amount of the total dividends to be paid to the creditors of the bank is uncertain.

22. Examinations of the books and records of the Citizens' Bank, made between February 23, 1928, and July 31, 1930, by examiners duly appointed by the Comptroller of the Currency, disclosed the execution of the said agreement of February 23, 1928, and the deposit of securities thereunder. Prior to the closing of the Citizens' Bank, neither the Comptroller nor his representatives communicated to the First Bank, the Citizens' Bank, or the Railroad any objection to the said agreement of February 23, 1928, or to the deposit of securities thereunder.

23. However, during, before, and after the said period of February 23, 1928, to July 31, 1930, when the said Comptroller was requested by national banks or others for an opinion upon the power of national banks to pledge securities to secure a private depositor, in every instance the Comptroller disapproved of such pledges by stating that in his opinion national banks had no such power. Neither the First Bank, the Citizens' Bank, nor the Railroad had knowledge or notice of any such opinion until after July 31, 1930.

24. It is stipulated and agreed by counsel for all parties to this suit that this case shall be decided by the court on the assumption that the acts complained of were not in violation of Rev. St. § 5242 (section 52 of the National Banking Act, 13 Stat. 115, now U. S. Code, title 12, § 91 [12 USCA § 91]).

### Conclusions of Law.

1. The agreement of February 23, 1928, between the First National Bank of Con-

nellsville and the Baltimore & Ohio Railroad Company, is illegal and void.

2. The receiver of the Citizens' National Bank of Connellsville, successor to the First National Bank of Connellsville, has a right to disaffirm the agreement of February 23, 1928, to have delivered to him the securities received by the Bank of Pittsburgh, National Association, thereunder without payment of the deposit of the Baltimore & Ohio Railroad Company.

3. Plaintiff is entitled to a perpetual injunction restraining the Bank of Pittsburgh from selling or otherwise disposing of the securities received under the agreement of February 23, 1928.

4. The Baltimore & Ohio Railroad Company, defendant, should pay two-thirds of the costs, the George H. Smith, receiver of the Citizens' National Bank of Connellsville, should pay one-third of the costs.

### Opinion.

■ The first question for determination is: Did the First Bank, a national bank, have the power to pledge part of its assets as security for the deposit of the Baltimore & Ohio Railroad Company?

The powers of a national bank are conferred by Rev. St. § 5136 (title 12 U. S. Code, § 24 [12 USCA § 24]), which provides that such a bank shall have power to adopt and use a corporate seal, to have succession for ninety-nine years, to make contracts, to sue and be sued, to elect or appoint directors and officers, to prescribe by-laws, and—

"Seventh. To exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of this chapter."

It is evident (and it is admitted) that national banks do not have express powers to make such a pledge. If such power exists, it is an incidental or implied power. There is no decision, federal or state, determining whether national banks possess such an implied power. In determining whether national banks do possess such an implied power, I will consider whether federal or state decisions (when made) should

control; the primary purpose for which a bank is created; the effect and consequences of an interpretation holding that national banks possess such a power; whether such an interpretation would be in conflict with public policy; the administrative construction of the act; the legislative interpretation thereof; the implied powers of a national bank; and the federal and state decisions relating to pledges to secure private deposits, public deposits, sureties on bonds for public deposits.

In Ex parte Tyler (1893) 149 U. S. 164, 187, 13 S. Ct. 785, 791, 37 L. Ed. 689, it is stated:

"Where the questions involved arise under the state constitution and laws, the decisions of its highest tribunal are accepted as controlling. Where the constitution or laws of the United States are drawn in question the courts of the United States must determine the controversy for themselves."

See also Kansas City Structural Steel Company v. Arkansas (1925) 269 U. S. 148, 150, 46 S. Ct. 59, 70 L. Ed. 204.

The question under consideration being the power of a national bank under the laws of the United States, this court must determine the question for itself as there is no federal precedent.

In 7 C. J. 473, it is stated:

"A bank is 'an association or corporation whose business it is to receive money on deposit, cash checks or drafts, discount commercial paper, make loans, and issue promissory notes payable to bearer, called "bank notes."'"

Also at page 475 that:

"Originally the business of banking consisted only of receiving deposits for safe-keeping and even at the present time a bank is primarily a place for the deposit of money, and the receiving of the money of others on deposit is a distinctive feature of the business of banking."

It is therefore a primary purpose of a bank to furnish to all persons desiring to avail themselves of the privilege, a safe place to deposit their money during such time or times as they may not desire to use it otherwise. To protect depositors, national banks are required, under the law, to have a specified minimum capital stock and to create and maintain a surplus fund. Double liability is placed upon the stockholders. Directors are required to take an oath before entering on their duties. There is a limit placed upon the indebtedness which such

banks may create. The financial condition of the bank must be published and its accounts are examined by the government.

■ It is a fundamental rule in the interpretation of a statute that the effect and consequences of the interpretation which may be made thereof should be considered. This rule is stated in Re Chapman, 166 U. S. 667, 17 S. Ct. 677, 680, 41 L. Ed. 1154, as follows:

"But nothing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion."

If the act under consideration was interpreted so as to confer an implied power on national banks to pledge their assets to secure private deposits, it would follow that a bank could pledge all its assets to secure the deposits of a few depositors. Arkansas-Louisiana Imp. Dist. v. Taylor, 177 Ark. 440, 6 S.W.(2d) 533 (1928). This would mean that most of the depositors in a bank would not have the principal security that was intended for their protection. Such depositors being without notice of such a condition would be misled in some cases to their injury, and the greatest security, which was intended for their benefit, would be secretly withdrawn. An act should not be construed so as to produce such an effect unless the language thereof requires it to be done.

■ All the legislation on the subject under consideration should be considered. North American Commercial Co. v. United States, 171 U. S. 110, 128, 18 S. Ct. 817, 43 L. Ed. 98. An act should be construed, unless its language plainly requires it so to be done, so as to be not in conflict with public policy. The Main v. Williams, 152 U. S. 122, 132, 14 S. Ct. 486, 38 L. Ed. 381.

The public policy of the United States in relation to national banks appears in the acts of Congress. These acts provide a set of rules such as we have already observed, which have for their primary purpose the safe-keeping and protection of the deposits of all the depositors of a bank. If the act under consideration is construed so that national banks possess implied power to pledge all their assets, or a material portion thereof, as security for a few private depositors, it takes away from the great majority of the depositors the greatest security which the law intended that they should have, and it violates the public policy of the nation as declared in its national banking laws.

In United States v. Jackson, 280 U. S. 183, 193, 50 S. Ct. 143, 146, 74 L. Ed. 361, it is stated:

"It is a familiar rule of statutory construction that great weight is properly to be given to the construction consistently given to a statute by the Executive Department charged with its administration. United States v. Cerecedo Hermanos y Compania, 209 U. S. 337, 28 S. Ct. 532, 52 L. Ed. 821; Robertson v. Downing, 127 U. S. 607, 8 S. Ct. 1328, 32 L. Ed. 269; United States v. Healey, 160 U. S. 136, 16 S. Ct. 247, 40 L. Ed. 369; and such construction is not to be overturned unless clearly wrong, or unless a different construction is plainly required. United States v. Johnston, 124 U. S. 236, 253, 8 S. Ct. 446, 31 L. Ed. 389; Hawley v. Diller, 178 U. S. 476, 488, 20 S. Ct. 986, 44 L. Ed. 1157."

See also Brewster v. Gage, Collector of Internal Revenue, 280 U. S. 327, 336, 50 S. Ct. 115, 74 L. Ed. 457.

The Comptroller of the Currency, being the officer charged with the administration of all national banking laws, has always advised national banks, beginning with a time before the pledge was made in this case and continuing until and after the appointment of a receiver, that national banks do not possess such a power. The Comptroller had knowledge of the pledge in this case and took no action thereon.

As already stated, the statutes of the United States do not confer on national banks express power to pledge their assets as security for private deposits. The statutes do confer such power for public deposits. Rev. St. § 5234 (title 12 U. S. Code, § 192 [12 USCA § 192]), Rev. St. § 5153 (title 12 U. S. Code, § 90 [12 USCA § 90]), provides that national banks shall be depositories of public money and that the Secretary of the Treasury shall require such banks to give satisfactory collateral security for such money. This section was amended June 25, 1930 (12 USCA § 90), by conferring upon such banks the power for state or municipal deposits, to give such security therefor as is required of state banking institutions by the laws of the state where the national bank is located.

It is fair to assume that Congress, in enacting the above provisions, was of the opinion, either that national banks did not have such power as to public deposits, or it doubted the existence of such a power. If this position is correct, then there is a stronger reason for believing that Congress

did not intend to confer an implied power on national banks to pledge their assets as security for private deposits.

In State ex rel. v. F. N. B. of St. Louis, 297 Mo. 397, 249 S. W. 619, 623, 30 A. L. R. 918 (1923), it is stated:

"Despite this fact where, as here, there is a general grant of power, however clear that grant may be, the enactment of subsequent legislation containing a specific kindred grant of power will afford at least persuasive support to the conclusion that the latter was not included within the former or the original grant. Such is the effect of the Act of Congress of March 3, 1865, section 5155, 3 U. S. Comp. Stats. 1901, p. 3467, now U. S. Comp. St. § 9695. This act provides that any bank or banking institution organized under a state law and having branches, may in conformity with existing law become a national bank and retain its branches. In the passage of this act it is evident that the legislative construction of the original is that it did not authorize the establishment of branch banks. Otherwise the subsequent section 5155 would not have been enacted."

There seems to have always been in the United States, and in some states, a marked distinction made between the security which a bank may give for a public deposit as distinguished from private deposits. The Comptroller seems to have consistently held that national banks may pledge its assets as securities for public deposits (see Report 1657, House of Representatives, 71st Congress, 2d Session, to accompany Senate Bill 486), while he has always taken the position that national banks do not possess this power as to private deposits.

I doubt the wisdom of the rule that banks should have implied power to give security for public deposits, which seems to be based on custom and on the assumption that the public, in its governmental capacity, should have a greater security for its deposits than private depositors have. It is to be noted, however, that the aggregate of public deposits is generally very small as compared with the aggregate or total of private deposits.

The implied powers of national banks, as stated in Rev. St. § 5136, are "all such incidental powers as shall be necessary to carry on the business of banking." In an early case, Mr. Chief Justice Waite said in relation to incidental powers:—"are such as are required to meet all the legitimate demands of the authorized business, and to enable a bank to conduct its affairs, within the general scope of its charter, safely and prudently." First Nat. Bank of Charlotte v. National Exchange Bank (1876) 92 U. S. 122, 127, 23 L. Ed. 679.

In Logan County National Bank v. Townsend, 139 U. S. 67, 11 S. Ct. 496, 498, 35 L. Ed. 107, Mr. Justice Harlan said:

"It is undoubtedly true, as contended by the defendant, that the national banking act is an enabling act for all associations organized under it, and that a national bank cannot rightfully exercise any powers except those expressly granted by that act, or such incidental powers as are necessary to carry on the business of banking, for which it was established."

While there is no decision, either state or federal, determining whether national banks do possess such an implied power, there is a strong dictum to the contrary.

In Parks v. Knapp, 29 F.(2d) 547, 550 (C. C. A. 8, 1928), it is stated:

"We are not advised that the transfer of a bank's assets to secure a depositor has become a general custom and thus so linked in practice with its express powers as to be recognized in the banking business as an incidental or implied power. We are inclined to believe with the Kentucky Court of Appeals and the Supreme Courts of Minnesota and North Dakota that such a practice is not in keeping with sound banking methods, can only result in unfair discrimination and preferential treatment of its depositors and ought not to be judicially approved. It enables those who are wary, usually because of large deposits, to gain advantage over the great number of small trustful depositors, and thus public confidence in banking institutions is shaken, to the public's detriment."

If the cases of the First National Bank of Charlotte v. National Exchange Bank, 92 U. S. 122, 127, 23 L. Ed. 679, and Logan County National Bank v. Townsend, 139 U. S. 67, 11 S. Ct. 496, 35 L. Ed. 107, state correctly the rule which is to govern in determining the implied powers of a national bank, then such banks have implied powers to do that which is "necessary to carry on the business of banking" and to do such acts "as are required to meet all the legitimate demands" of its authorized business and which are necessary "to conduct its affairs, within the general scope of its charter, safely and prudently."

The power to pledge its assets to secure private depositors is not necessary to carry on the business of a national bank. Banks should properly keep a large part of its own

assets and of its deposits invested. Depositors may abnormally withdraw their deposits so as to make it necessary for a bank to raise money by loan and as an incident thereto, to pledge a portion of its assets. There is no such necessity for private deposits. In fact, such pledges, if they become known, would probably threaten the safety of a bank.

In Commercial Banking & Trust Co. v. Citizens' Trust & Guaranty Co., 153 Ky. 566, 156 S. W. 160, 163, 45 L. R. A. (N. S.) 950, Ann. Cas. 1915C, 166 (1913), it is stated:

"The exercise of such a power is therefore clearly beyond the terms of the law, or any reasonable or necessary implication which the court would be authorized to deduce from the language of the statute, and would tend to lessen the usefulness of banks as great public institutions by destroying public confidence in them. Such a practice, if indulged and authorized, might work great injustice and inflict financial loss, not only upon the depositors, but upon the stockholders as well. Large depositors, if secured, might absorb the greater part of the assets of the bank, and inflict loss upon unsecured depositors and financial ruin upon innocent stockholders under the double liability law. The law contemplates, and was evidently framed to insure, fair and uniform dealings by the banks with all of their depositors. A secret pledge to secure one, while others are left without security, although it may be without specific intent to defraud, would nevertheless, in case of loss, justify such an inference. Public policy will not, therefore, tolerate a practice which might, sooner or later in the event of financial trouble with the bank, enable it to pay and protect the favored few at the expense of the equally deserving many. If the fact was known that a bank had secured some one or more of its depositors and left the others unsecured, no prudent person would deposit with it. No bank would advertise that if engaged in such a practice, because depositors, who were not provided for, would be driven away. The very fact that the transaction is one that will not stand the test of publicity is a strong argument against its legality, as well as its necessity. Banks publish statements of their assets, and individuals deposit on the faith of these published statements. It is well known that good statements as to assets induce people to deposit their money in banks making such statements. It would be a crowning act of injustice to hold that deposits thus induced are nevertheless cut off from sharing in these assets until some unknown favored few, who have been secretly secured, are satisfied; and it would be a palpable fraud on the part of a bank thus to procure deposits, when its assets were secretly pledged."

Such a power is not necessary to carry on the business of banking; it is not safe, and, therefore, it should not be implied.

Our attention has been called to two state decisions, Ahl v. Rhoads, 84 Pa. 319, and Ward v. Johnson, 95 Ill. 215, which are said to hold that state banking institutions may pledge their assets to secure private deposits. In Ahl v. Rhoads (1877), a state banking institution assigned a mortgage held by it to a depositor in order to induce him not to withdraw his loan, and it was provided in the agreement that instead of the depositor's account being subject to payment on call it should be payable one year thereafter. In foreclosure proceedings, judgment was entered for plaintiff, which judgment was affirmed by the Supreme Court of Pennsylvania. That court sustained the validity of the pledge although the principal discussion in the opinion is whether the indebtedness created by the mortgage was done in violation of a provision under the state constitution. It is to be noted, however, that the deposit in this case seems to have been changed from a deposit to a loan.

In Ward v. Johnson, it appears that a state bank organized an investment department under which parties loaning money to the bank or making deposits were secured by a deed of trust for the payment of their loans or deposits; said deed of trust being on property of the bank. This was held to be valid. The transaction could properly be classified as a loan.

The state courts are in conflict as to whether state banking institutions have implied powers to pledge their assets as security for public deposits. In Richards v. Osceola Bank, 79 Iowa, 707, 45 N. W. 294 (1890), Andrew v. Odebolt Savings Bank, 203 Iowa, 1335, 214 N. W. 559 (1927), and First National Bank & Trust Co. v. Palm Beach, 96 Fla. 247, 117 So. 900, 65 A. L. R. 1398 (1928), it is held that state banking institutions do possess such implied power. In Cameron v. Christy, 286 Pa. 405, 409, 133 A. 551, it is held that the Pennsylvania statute conferred on state banking institutions the power to receive deposits and issue obligations therefore implied a power to pledge assets as securities therefor.

In Divide County v. Baird, Receiver, 55 N. D. 45, 212 N. W. 236, 51 A. L. R. 296

(1926); Farmers' & Merchants' State Bank v. Consolidated School District, 174 Minn. 286, 219 N. W. 163, 65 A. L. R. 1407 (1928); Farmers' State Bank v. County of Marshall, 175 Minn. 363, 221 N. W. 242 (1928); Arkansas-Louisiana Highway Improvement Dist. v. Taylor, 177 Ark. 440, 6 S.W.(2d) 533 (1928); and Austin v. Lamar County (Tex. Com. App. 1930) 26 S.W.(2d) 1062, it is held that state banking institutions do not possess such an implied power.

The state courts are in conflict as to whether state banking institutions have implied power to pledge their assets in favor of a surety on a bond given for a public deposit. In McFerson v. National Surety Co., 72 Colo. 482, 212 P. 489 (1923); Page Trust Co. v. Rose, 192 N. C. 673, 135 S. E. 795 (1926); United States Fidelity & Guaranty Co. v. Bassfield, 148 Miss. 109, 114 So. 26 (1927); and Ainsworth v. Kruger, 80 Mont. 468, 260 P. 1055 (1927), it is held that banking institutions do possess such an implied power. In Commercial Banking & Trust Co. v. Trust & Guaranty Co., 153 Ky. 566, 156 S. W. 160, 45 L. R. A. (N. S.) 950, Ann. Cas. 1915C, 166 (1913), and Schornick v. Butler (Ind. Sup. 1930) 172 N. E. 181, it is held that state banking institutions do not possess such an implied power.

In Mothersead v. U. S. F. & G. Co., 22 F.(2d) 644, 653 (C. C. A. 8, Okl. 1927), the court said:

"These securities therefore could have been pledged directly to the state or municipality for the public deposit. Here the pledge was to the surety company, which in turn secured the deposit by its surety bond. Under well settled principles of suretyship law, the securities pledged were held by the surety company in trust for the obligees in the bonds. Chamberlain v. St. Paul & S. C. R. Co., 92 U. S. 299, 23 L. Ed. 715; Tompkins Co. v. Catawba Mills (C. C.) 82 F. 780, 784; Eastman v. Foster, 8 Metc. (49 Mass.) 19; Chambers v. Prewitt, 172 Ill. 615, 50 N. E. 145; 21 R. C. L. p. 1094, § 132; Section 5161, Comp. St. Okl. 1921. On the other hand, if the pledges had been made directly by the banks to the state or municipality, the surety company would now be subrogated to such securities. Maryland Casualty Co. v. Repass (C. C. A. 4) 253 F. 328; Ricker v. Ricker, 248 Mass. 549, 143 N. E. 539; 25 R. C. L. pp. 1377, 1378, § 6061; Stearns on Suretyship (3d Ed.) § 247."

On the question of the implied powers, the result seems to be that there is no de-cision, federal or state, determining whether national banks do possess such power as to a private deposit. There is a strong dictum in one circuit against the existence of such a power. There are two old and rather feeble decisions which hold that state banking institutions have such implied power as to private deposits. The state decisions are in conflict as to whether state banking institutions have implied power to pledge their assets for public deposits, or to sureties on bonds for public deposits.

It is argued that a national bank having implied power to borrow money and to pledge its assets as security therefor, that the same implied power should exist as to deposits. In each case the relation of creditor and debtor exists. As banks may, at times, find it necessary to make loans, there is a necessity that it be enabled to exercise such power by the pledging of collateral. No such necessity exists as to a private deposit. If a bank deems it advantageous to secure a depositor by giving security for his deposit, it may do so by giving a surety bond. This can be done without taking from other depositors the protection which the law intended that they should have. For cases which illustrate the distinction between a loan and a deposit, see Farmers' & Merchants' State Bank v. Consolidated School District, 174 Minn. 286, 219 N. W. 163, 65 A. L. R. 1407 (1928), and Divide County v. Baird, 55 N. D. 45, 212 N. W. 236, 51 A. L. R. 296 (1926).

By reason of the disastrous effect and consequences likely to result from conferring on national banks, power to pledge all their assets or a material portion thereof, to secure private deposits; that such an interpretation would be against public policy as declared in the national banking laws; and the administrative interpretation is against such power; that the legislative interpretation recognizes its nonexistence, and such a power being not necessary or even safe to carry on the business of banking—the question under consideration is answered in the negative, that the First Bank did not have power to pledge part of its assets as security for the deposit of the Baltimore & Ohio Railroad Company.

If the First National Bank did not have the power to pledge its assets as security for the deposit of the Baltimore & Ohio Railroad Company, has the receiver a right to disaffirm such contract and recover the assets pledged thereunder? Counsel for the Railroad Company contend that the said

bank could not disaffirm the agreement and, therefore, the receiver cannot disaffirm. In support of this contention counsel cite Cameron v. Christy, 286 Pa. 405, 133 A. 551; Page Trust Co. v. Rose, 192 N. C. 673, 135 S. E. 795; Logan County National Bank v. Townsend, 139 U. S. 67, 11 S. Ct. 496, 35 L. Ed. 107, and Central Transportation Co. v. Pullman's Car Co., 139 U. S. 24, 60, 11 S. Ct. 478, 35 L. Ed. 55.

If we are correct in our conclusion that national banks do not possess implied power to secure private deposits by pledges of their assets, that to so hold would cause disastrous consequences to such banks and their depositors, that such an interpretation of the act, or a contract with such provision, would be against public policy, and therefore void, it would seem to logically follow that the law will not permit to be done indirectly that which cannot be done directly, and that the doctrine of estoppel should not be permitted to circumvent the public policy of the Nation.

In California Bank v. Kennedy, 167 U. S. 362, 371, 17 S. Ct. 831, 835, 42 L. Ed. 198, it is stated:

"As was said by this court in Union Pac. Ry. Co. v. Chicago, etc., Railway, 163 U. S. 564, 16 S. Ct. 1173 [41 L. Ed. 265]; speaking through Mr. Chief Justice Fuller (page 581, 163 U. S., and page 1180, 16 S. Ct.):

" 'A contract made by a corporation beyond the scope of its powers, express or implied, on a proper construction of its charter, cannot be enforced, or rendered enforceable, by the application of the doctrine of estoppel.' "

See 14a Corpus Juris, 309, § 2158.

In Porter v. Canyon County Farmers' Mutual Fire Insurance Co., 45 Idaho, 522, 263 P. 632, 634 (1928), it is stated:

"The defendant insurance company adroitly argues that the commissioner stands in the shoes of the bank, and, not having rescinded or offered to return defendant's deposit, is estopped to demand relief. In other words, the parties being in pari delicto, the law will not aid the one as against the other. The fallacy of the argument is at once evident. While it is true, as was said in State v. City of Sapulpa, 58 Okl. 550, 160 P. 489, that, 'where the bank commissioner assumes possession of a state bank, he does not take the assets thereof for value and without notice, but subject to all claims and defenses that might have been interposed against the bank had it continued under its corporate management,' this cannot serve to defeat equities superior to those of parties asserting the particular defense. Under the laws of this state, the commissioner stands as a trustee to protect the rights of all claimants, particularly those of depositors and general creditors. Under the law, the right of the defendant can be only that of a general depositor as such; it can acquire no greater right than that inuring to any other general depositor as such. Such equity as it may claim under its pledge agreement rests upon a nullity, an outlawed contract, and would work an injury to every other depositor in its own class. Furthermore, 'the doctrine of estoppel has no application to a contract void because it violates an express mandate of the law or the dictates of public policy.' 6 Cal. Juris 150, § 106. There is no place here for the doctrine that the law will leave the parties where it finds them. The basis of such a rule is that the courts will not aid or reward a wrongdoer. The depositors whom the commissioner represents have done no wrong. As was said in Divide County v. Baird, supra. 'Shall they be punished for the misdeeds of the guilty?' * * *

"Were defendant's contention sustained, the purpose of the statute would be defeated. Once the parties were successful in executing their unlawful scheme, the victims of the legal fraud, although they were also the beneficiaries of the statute which had been flouted, would be helpless. As to them the statute would have been wholly abrogated, and the Legislature made a laughing stock. It must therefore follow that the defendant cannot retain the assets which the bank attempted to hypothecate, and thereby sorely defraud the very persons for whose protection the statute was enacted."

In Divide County v. Baird, 55 N. D. 45, 212 N. W. 236, 242, 51 A. L. R. 296 (1926), it is stated:

"The validity of the pledge is here challenged by the receiver. He represents more than the insolvent bank; he represents the creditors and general depositors of the bank. Michie, Banks and Banking, vol. 1, § 77 (3b). The latter are innocent parties and have equities which are superior to those of the plaintiff against whom the defense of ultra vires is interposed. See Lyons v. Benney, 230 Pa. 117, 34 L. R. A. (N. S.) 105, 79 A. 250. As between the creditors and depositors of an insolvent bank, whose contractual relation with the corporation

was created lawfully—intra vires—and the plaintiff, whose contract of pledge was ultra vires of the bank and unlawful, the former must be preferred, and the rule is that they are not estopped to assert the want of power. * * *

"It is said that this court must leave the parties to the illegal contract where it finds them, and that the receiver will not be permitted to recover the securities. To be left where and as found is precisely all the county can desire—with the illegally obtained collateral in its possession. In some way, which does not clearly appear, the receiver, although he represents the depositors and it is his duty to protect their interests, is supposed to be estopped from recovering the possession unless he first pays the money, or 'deposit,' which the bank received at the time when it and the county entered into the unlawful arrangement.

"It appears to me that this position fails to take note of the status of the receiver of an insolvent bank. He is an arm or officer of the court appointing him, yet, at the same time, he represents the creditors and stockholders of the corporation in more than a merely theoretical or academic sense. Viewed from this standpoint, his status is such that it is his duty to vindicate and protect the rights of the depositors. Under the law, they have the legal right to demand that the assets of the bank shall not be pledged to secure favored depositors. * . * *

"It is the duty of the receiver to administer the estate for the benefit of those who may ultimately establish a right to share in its distribution; and he must assert the equitable as well as the legal rights of the creditors. See, generally, 23 R. C. L., pages 7 and 8, and cases cited.

"This court has adopted the view that the receiver of an insolvent bank, in addition to being an officer of the court, represents the creditors (depositors) as well. * * * The basis of the rule that the courts will leave the parties to an illegal contract where it finds them is that it will not aid or reward a wrongdoer. Here the depositors are guilty of no wrong; shall they be punished for the misdeeds of the guilty? When the wrong was done, they were powerless to speak or prevent it; now an officer of the court is charged with the duty of protecting their interests. Shall we say to him that there is no remedy whereby the innocent may be protected from the consequences of the unlawful conduct of others? Section 22 of our Constitution provides that: 'The

courts shall be open, and every man for an injury done him * * * shall have remedy by due process of law. * * *'

"And yet it is said that the court, after finding the injury, can only slap the defunct bank and the delinquent county on the wrist, and say to the depositors: 'We must leave you where we find you; we can do nothing, because the transaction was illegal, and you have not returned something which, not you, but the bank got from the plaintiff.'

"To state the position ought to be sufficient to demonstrate its utterly untenable character. Such a holding would be a confession of judicial impotence to which this court is not prepared to subscribe. It would mean a notice to the people of this state that we are alike powerless to correct the wrongs which have been committed in the past and to prevent their repetition in the future. Once the parties are successful in executing their unlawful purpose, the victims of the legal fraud, although they are also the beneficiaries of the statutes which have been flouted, are helpless, and this court can do no more than convert itself into a debating society where legal theories may be expounded without practical or useful results. A tribunal without power to do justice is not a court of equity, but an academy. If we are powerless to give effect to the plainly expressed purpose of the Legislature to protect depositors, it is a usurpation to assume the name and put on the semblance of a court of equity."

In Farmers' & Merchants' State Bank v. Consolidated School District, 174 Minn. 286, 219 N. W. 163, 166, 65 A. L. R. 1407 (1928), it is stated:

"Were it otherwise, the right of bank creditors to share in the assets unaffected by unlawful pledges thereof to favored depositors would be of little value."

In our opinion, the principles laid down in the three preceding cases are sound and should be followed: That the doctrine of estoppel should not be applied as was done in Cameron v. Christy and Trust Company v. Rose, supra.

There are cases decided by the Supreme Court where it has been held, although a contract was ultra vires and void, that recovery would be permitted of the benefits received thereunder because it would be inequitable and unconscionable to hold otherwise. An example of such a case is Citizens' Central National Bank of New York v. Appleton, Receiver, 216 U. S. 196, 30 S. Ct. 364, 54 L. Ed. 443, where a bank guar-

anteed a note and by virtue thereof received money thereon. It was held that although the bank's attempted guaranty was ultra vires and void, it would be unjust to permit the bank on this ground to keep the money which it would not have otherwise received. Another illustrative case is Logan County National Bank v. Townsend, supra, wherein plaintiff sold certain bonds to the bank under an agreement that the bank, upon demand, would replace the bonds at the same or a less price. Subsequently plaintiff demanded compliance with his contract, but the bank refused on the ground that the agreement was ultra vires. The court held that although the contract was ultra vires, the bank was not exempt from liability to either return the bonds or to pay the price which it had agreed to in lieu thereof.

These cases are distinguishable from the present case. In those cases the return of money received by virtue of a guaranty, or the return of the bonds, or the payment of the price agreed upon worked no injury to the bank, its creditors or stockholders, and while the contracts were ultra vires, they were not against public policy. In this case the contract is against public policy. The execution thereof was a fraud upon the general depositors of the bank, as they had a right to believe and assume that all of the assets of the bank were a security for their deposits (other than public deposits), while the effect of the contract was to secretly reduce the amount of the security of the general depositors.

I therefore conclude that the receiver had a right to disaffirm the contract and recover the securities pledged.

Let a decree be prepared and submitted in accordance with the foregoing findings of fact, conclusions of law, and this opinion.